KELLY BATES & others[1] *vs.* DIRECTOR OF THE OFFICE OF
CAMPAIGN & POLITICAL FINANCE & another.[2]

Suffolk. December 3, 2001. February 7, 2002. - February 25, 2002.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Massachusetts Clean Elections Law. Elections,* Political contributions.
*Initiative. General Court. Constitutional Law,* Appropriation of money.
*Statute,* Construction. *Governmental Immunity. Waiver. Secretary of the
Commonwealth. Injunction.*

Article 48, The Initiative, V, § 1, of the Amendments to the Massachusetts
Constitution, providing that "[n]o measure that . . . makes a specific ap-
propriation of money from the treasury of the Commonwealth shall be
proposed by an initiative petition; but if a law approved by the people is
not repealed, the general court shall raise by taxation or otherwise and
shall appropriate such money as may be necessary to carry such law into
effect," is unambiguous in its constitutional command that, for as long as a
law enacted by way of initiative has not been repealed, the Constitution
requires that the Legislature appropriate the funds necessary to its
operation. [154-161] GREANEY, J., concurring, with whom IRELAND, J.,
joined; SPINA, J., dissenting, with whom COWIN, J., joined; COWIN, J., dis-
senting, with whom SPINA, J., joined.

Language in the Massachusetts Clean Elections Law, G. L. c. 55A, §§ 1 et
seq., providing that the distribution of any clean elections funds was
"subject to appropriation," did not restrict the Legislature's power and
discretion over appropriations to any greater extent than was inherent in
the operation of the mandate of art. 48, The Initiative, V, § 1, of the
Amendments to the Massachusetts Constitution, that the Legislature "shall
appropriate" funds for a law passed by initiative that it has not repealed;
consequently, the insertion of the words "subject to appropriation" was not
in fact required in order to avoid the "specific appropriation" exclusion of
art. 48: even absent the phrase "subject to appropriation," the clean elec-
tions law would not constitute a "specific appropriation" under art. 48.
[161-164] GREANEY, J., concurring, with whom IRELAND, J., joined; SPINA, J.,
dissenting, with whom COWIN, J., joined; COWIN, J., dissenting, with whom
SPINA, J., joined.

---

[1]Twenty-seven other qualified voters of the Commonwealth, seven of whom
are candidates or potential candidates for electoral office: Sarah Cannon
Holden, James O'Keefe, Douglas Petersen, Evan Slavitt, Stephen Spain, Jill
Stein, Warren Tolman; Common Cause Massachusetts; Massachusetts Voters
for Clean Elections; Massachusetts Republican State Committee; and Mas-
sachusetts Green Party.

[2]Secretary of the Commonwealth.

Nothing in the provisions of the Massachusetts Clean Elections Law, G. L. c. 55A, §§ .1 et seq., providing that distribution of any clean elections funds was "subject to appropriation," relieved the Legislature of its constitutional duties under art. 48, The Initiative, V, § 1, of the Amendments to the Massachusetts Constitution, to appropriate funds to carry into effect a law passed by initiative that had not been repealed. [164-168] GREANEY, J., concurring, with whom IRELAND, J., joined; SPINA, J., dissenting, with whom COWIN, J, joined; COWIN, J., dissenting, with whom SPINA, J., joined.

Having determined that art. 48, The Initiative, V, § 1, of the Amendments to the Massachusetts Constitution mandated that the Legislature "raise by taxation or otherwise" and "appropriate such money as may be necessary" to carry into effect G. L. c. 55A, §§ 1 et seq., the Massachusetts Clean Elections Law, this court concluded that the statutory scheme of the clean elections law foreclosed the defense of sovereign immunity, and also that one candidate was entitled to a judgment in his favor in the amount to which he was entitled as a candidate certified by the Director of the Office of Campaign and Political Finance, where the Commonwealth's liability arose from the affirmative acts of the director in certifying the candidate as a clean elections candidate under c. 55A, and from the inextricable relationship established by the statute between clean elections certification and clean elections funding. [168-175] GREANEY, J., concurring, with whom IRELAND, J., joined; SPINA, J., dissenting, with whom COWIN, J., joined; COWIN, J., dissenting, with whom SPINA, J., joined.

Absent clean elections funds to distribute (G. L. c. 55A, § 8), authority to reach those funds, or any appropriation from the Legislature, the Director of the Office of Campaign and Political Finance had no power to order that monies be disbursed to "all eligible candidates" under the Massachusetts Clean Elections Law, G. L. c. 55A, §§ 1 et seq., and this court therefore declined to grant declaratory or injunctive relief ordering him to do so; further, this court declined to speculate about the legal impact, if any, that a legislative repeal of the clean elections law might have on the 2002 State elections or on any clean elections candidate. [175-176] GREANEY, J., concurring, with whom IRELAND, J., concurred.

In an action commenced under G. L. c. 214, § 1, by plaintiff supporters of the Massachusetts Clean Elections Law, G. L. c. 55A, §§ 1 et seq., the plaintiffs were not entitled to injunctive relief barring the Secretary of the Commonwealth from holding any elections unless and until such funds had been made available to all eligible clean elections candidates. [176-178] GREANEY, J., concurring, with whom IRELAND, J., joined.

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on October 4, 2001.

The case was reported by *Martha B. Sosman,* J.

*John C. Bonifaz* (*Bonita P. Tenneriello,* of Michigan, & *John H. Henn* with him) for the plaintiffs.

*Peter Sacks,* Assistant Attorney General, for the defendants.

The following submitted briefs for amici curiae:

*Joshua M. Davis, David S. Friedman & James Roosevelt, Jr.,* for Massachusetts Democratic State Committee.

*Robert J. O'Regan & Frederick S. Paulsen* for Jay Kaufman & others.

*Joel M. Sowalsky* for James W. Segal.

The following submitted memoranda:

*Michael W. Morrissey,* State Senator.

*Marie J. Parente,* State Representative.

*Shannon P. O'Brien* for Shannon O'Brien Committee.

*Thomas F. Reilly,* Attorney General, *& Peter A. Sacks,* Assistant Attorney General, for the Attorney General.

*Shaun P. Kelly,* State Representative.

MARSHALL, C.J. On November 3, 1998, the Massachusetts Clean Elections Law, G. L. c. 55A, §§ 1 et seq. (clean elections law), was approved overwhelmingly by the people, under the initiative provisions of art. 48, The Initiative, V, § 1, of the Amendments to the Massachusetts Constitution. See St. 1998, c. 395 (inserting G. L. c. 55A and amending related statutes). The law creates a system that allows electoral candidates for Massachusetts State or Statewide offices[3] who, among other requirements, limit the amount and sources of private campaign contributions they accept, to receive public campaign funding.

Because the clean elections law was enacted by popular initiative, it engages art. 48, which provides that "if a law approved by the people is not repealed, the general court shall raise by taxation or otherwise and shall appropriate such money as may be necessary to carry such law into effect."[4] To date, the clean elections law has not been repealed, nor has the General

---

[3]The term "Statewide office" refers to the offices of Governor, Lieutenant Governor, Attorney General, Treasurer and Receiver General, Secretary of the Commonwealth, and Auditor. G. L. c. 55A, § 1. "State office" is defined as the Statewide offices and the offices of Councillor, State Senator, and State Representative. *Id.*

[4]Article 48 also provides that "[s]ubject to the veto power of the governor and to the right of referendum by petition as herein provided, the general court may amend or repeal a law approved by the people." Art. 48, General Provisions, VI.

Court of Massachusetts (the Legislature) appropriated any money to carry it into effect.

In October, 2001, with the 2002 Massachusetts election season already under way, supporters of the clean elections law commenced an action in the county court under G. L. c. 214, § 1, against the Director of the Office of Campaign and Political Finance (director) and the Secretary of the Commonwealth (Secretary). They sought a declaration that any Massachusetts State or Statewide election held without access to the funds mandated by the clean elections law would violate both art. 48 and the clean elections law. They also sought permanent injunctive relief ordering the director to provide public campaign funds to all candidates entitled to such funds, and barring the Secretary from holding any elections unless and until such funds had been made available to all eligible candidates.

The plaintiffs promptly sought a preliminary injunction in the county court, which the defendants opposed, to order the director to distribute public funds immediately to qualified clean elections candidates.[5] Noting that no candidate had yet been certified under the clean elections law to receive public funds, a single justice denied the motion solely on the issue of irreparable harm. But see note 7, *infra*. She then reserved and reported the matter to the full court on an expedited schedule, on the plaintiffs' corrected complaint, a stipulation in lieu of the defendants' answer, and a statement of agreed facts.[6] Subse-

---

[5]In support of a preliminary injunction, the plaintiffs filed affidavits of candidate plaintiffs attesting to the importance of campaign financing to their actual or intended political campaigns, and alleging "irreparable harm" to their candidacies from the unavailability of public campaign funds. The plaintiffs also filed an affidavit from a gubernatorial candidate who had filed and then withdrawn a declaration of intent under the clean elections law, allegedly because the lack of available public campaign financing made it impossible to mount an effective campaign against nonparticipating candidates. The parties have stipulated that another candidate for Statewide office also had filed and then withdrawn a declaration of intent to participate in the Massachusetts clean elections process.

[6]The parties stipulated that the defendants need not respond to the complaint at this stage, and that by not responding the defendants had not admitted or waived any objection to any allegation of the complaint that was not included in the statement of agreed facts.

quently, one plaintiff, a candidate for Governor, was certified by the director as a clean elections candidate.[7]

We are asked to decide whether the director, the executive agent charged with implementing the clean elections statute, has any present duty to distribute public funds to certified candidates for electoral office where the Legislature has not appropriated any monies for disbursement to such candidates. See G. L. c. 10, § 42. That question requires us to examine the scope of the Legislature's duties under art. 48 after a law has been enacted by initiative, an issue of first impression. The constitutional command is plain and unambiguous. If a measure properly enacted by the people is not repealed, the Legislature "shall" raise by taxation or otherwise and "shall" appropriate funds to "carry such law into effect." Art. 48, The Initiative, II, § 2. Here, however, the measure enacted by the people provides that the distribution of funds to qualified candidates is "subject to appropriation." G. L. c. 55A, § 8 (*a*). We must therefore also decide whether the terms of the clean elections statute operate to relieve the Legislature of its obligations under art. 48. We hold that the clean elections initiative was validly enacted into law by the people of Massachusetts, and that nothing in that law relieves the Legislature of its constitutional duties under art. 48.[8]

Only after we have delineated the Legislature's duties under

[7]The parties stipulated at oral argument that on November 30, 2001, the plaintiff Warren Tolman was certified by the director as a gubernatorial candidate, making him presently eligible to receive up to $1,622,100 in clean elections funds for his primary campaign, one-half of which he was to receive five business days after certification. See G. L. c. 55A, §§ 7, 8 (*a*) (1), and 13. The parties also stipulated that Tolman is presently entitled to $811,050 in public campaign financing under the clean elections law.

[8]On January 25, 2002, we issued a memorandum and order stating in part that, "[u]nless the Legislature has repealed a law that has been enacted by way of initiative, the Legislature is mandated by art. 48 to raise by taxation or otherwise and to appropriate such money as may be necessary to carry the law into effect." A copy of the memorandum and order is attached as an Appendix. We further concluded that the " 'subject to appropriation' language contained in G. L. c. 55A, § 8 (*a*), and in G. L. c. 10, § 42, was not required to avoid the 'specific appropriation' exclusion of art. 48, and with or without that language the measure is not a 'specific appropriation' under art. 48." Appendix, *post* at 180. We also concluded that "[n]othing in the provisions of the clean elections statutes, including the language 'subject to appropriation'

art. 48 can we consider what relief, if any, is available to any plaintiff. For the reasons we describe below, we conclude that plaintiff Tolman has suffered a cognizable injury under the clean elections statute. That injury arose as a result of affirmative actions taken by the director to enable candidates to participate in the clean elections certification process, including certifying Tolman as a clean elections candidate. See G. L. c. 55A, § 5. In consequence of being certified, Tolman is owed $811,050, and is entitled to a judgment in his favor in that amount.

As to the broader relief sought by the plaintiffs, we conclude that they are not entitled to declarations against either the director or the Secretary. The drastic remedy of enjoining the Secretary from conducting all Massachusetts State elections, including all those elections where there may be no candidates who are or intend to be clean elections candidates, is not warranted. Injunctive relief requiring the director to provide full funding to all qualified clean elections candidates is similarly inappropriate. Because the director has no clean elections funds to distribute and no authority on his own to reach those funds, he cannot be enjoined to distribute them.

## I

We summarize the salient facts from the statement of agreed facts and other undisputed material of record. The plaintiffs are electoral candidates, Massachusetts voters, and organizations supportive of the clean elections law. The defendant director is an official of the executive branch of the Massachusetts government; among his statutory duties are certifying candidates, distributing monies from the clean elections fund, and promulgating rules and regulations under the clean elections law. See G. L. c. 55A, §§ 5, 8, 14. The office of Secretary, also a part of the executive branch, was created by the Massachusetts Constitution. See Part II 2, c. 2, § 4, arts. 1 and 2, of the Massachusetts Constitution, and art. 17 of the Amendments to the Constitution. The constitutional and statutory duties of the Secretary include administering the Massachusetts election

referred to above, relieves the Legislature of its constitutional duties under art. 48." *Id.*

laws. E.g., art. 48, General Provisions, IV, as amended by art. 74, § 4, of the Amendments (Information for Voters) (printing and distribution to voters of initiative or referendum petition and related documents); G. L. c. 53, § 7 (promulgation of regulations designed to achieve and maintain accuracy, uniformity, and security from forgery and fraud in the nomination certification process).

The present controversy arises in the midst of the 2002 Massachusetts election season. The primary campaign period, from March 31, 2001, to September 17, 2002, has already begun. See St. 2000, c. 159, § 325, an emergency act, approved July 28, 2000, and made effective July 1, 2000, St. 2000, c. 159, § 498. The general election campaign period begins September 18, 2002. The election will decide, among other State offices, the Governor and Lieutenant Governor, who each serve four-year terms, and State Senators and State Representatives, who each serve two-year terms.[9]

The statute at the heart of this controversy, the clean elections law, was approved at the November, 1998, general election by a majority of Massachusetts voters in every electoral district, and approved Statewide by a ratio of two to one.[10] Under the law, candidates for State or Statewide office, see note 3, *supra*, who choose to participate in the clean elections system agree, among other things, to limit the amount of their primary and general election campaign contributions and expenditures. In return, once they are certified by the director, these candidates receive a substantial amount of their allowable campaign expenditures — approximately 80% — from the public treasury.

The clean elections law is funded by the clean elections fund,

---

[9]It appears that the 2002 primary and general elections are the first in which the clean elections law may be fully implemented. The clean elections law applies to all election cycles for Statewide office on or after November 1, 1998, and to all elections cycles for other State offices beginning on or after November 1, 2000. G. L. c. 55A, § 18. But see St. 2000, c. 159, § 325, an emergency act, approved July 28, 2000, and made effective July 1, 2000, St. 2000, c. 159, § 498 (establishing March 31, 2001, as the beginning of the 2002 election cycle).

[10]The measure was enacted by 66% of voters voting on the measure (1,129,934 yes votes to 572,467 no votes), with 12% of Massachusetts voters (232,867) not voting on the measure. See Secretary of the Commonwealth, Massachusetts Election Statistics 1998, Pub. Doc. No. 43, at 421 (1998).

G. L. c. 10, § 42, also created as part of the successful initiative petition. See St. 1998, c. 395, § 3 (amending G. L. c. 10, § 42). The clean elections fund presently contains approximately $23 million. That sum was accumulated in large part from transfers of $10 million in each of fiscal years 2000 and 2001 from the general fund to the clean elections fund in annual budget bills passed by the Legislature and signed by the Governor. These funds were expressly set aside to be available for the 2002 State elections. See St. 1999, c. 127, § 2, line item 0920-0302; St. 2000, c. 159, § 361.[11] Other sources of revenue for the clean elections fund include money contributed by individual taxpayers through voluntary checkoffs on their State income tax returns, see G. L. c. 62, § 6C, and G. L. c. 10, § 42; money transferred from a previous Massachusetts public campaign fund, see St. 1998, c. 395, §§ 3-5; and certain fines, penalties, and other revenues, see G. L. c. 10, § 42.

That money has been set aside for a particular fund, here $23 million for the clean elections fund, does not in the ordinary course make these funds available to the director (or anyone else in the executive branch) for distribution, because setting aside money in a fund does not, without more, amount to an "appropriation" to executive officials. See *Gilligan* v. *Attorney Gen.*, 413 Mass. 14, 17 (1992). Other steps are required. Specifically, the clean elections law obligates the director to determine annually the amount of funds required for the law's "full implementation."[12] See G. L. c. 55A, § 14 (*d*). Once he makes that determination, he must then make a request to his designated "[b]udget director," see G. L. c. 29, § 1, to include the required amount in the Commonwealth's annual budget. See G. L. c. 55A, § 14 (*d*); G. L. c. 29, § 3. The director has complied with the statutory requirements to request clean elec-

---

[11]The fiscal year 2000 appropriation was made to the clean elections fund "for advance funding" of the public finance requirements of the clean elections law, and was not to be "available for appropriation from said fund until the elections scheduled to be held in the year 2002." St. 1999, c. 127, § 2, line item 0920-0302. The fiscal year 2001 appropriation contains similar language. See St. 2000, c. 159, § 361.

[12]In a letter dated May 9, 2000, to the Chair of the House Committee on Ways and Means, the director estimated the cost of fully funding the clean elections law for the 2002 election cycle to be approximately $30.3 million to $37.6 million.

tions funds for candidates running for election in the 2002 election cycle, but the Legislature has not appropriated any monies to the clean elections fund.[13]

The process of qualifying for clean elections funding is detailed and specific. Candidates become eligible to receive public campaign funds on certification by the director. See G. L. c. 55A, §§ 5, 8. The certification process begins during a "[q]ualifying period." This is a period prior to State elections during which each prospective candidate must collect a certain number of qualifying contributions of from five to one hundred dollars from voters who sign a form stating that they wish the participant to be eligible for clean elections funding. See G. L. c. 55A, § 1.[14] The minimum number of qualifying contributions that a candidate must garner before he or she has access to public campaign funds is modest; it ranges from 200 for candidates for State Representative to 6,000 for candidates for Governor. See G. L. c. 55A, § 4.[15]

During the election cycle,[16] and before the end of the qualifying period, a candidate must also file with the director a

---

[13]On November 21, 2001, the Legislature enacted and set before the Governor a fiscal year 2002 general appropriations bill that included no appropriation to implement the clean elections law. See St. 2001, c. 177, signed by the Governor on December 1, 2001.

[14]For the 2002 elections, the qualifying period for party-affiliated political candidates for Statewide office is August 1, 2001, to June 4, 2002; the qualifying period for unenrolled candidates for Statewide office is August 1, 2001, to August 27, 2002; and the qualifying period for other candidates is January 1, 2002, to May 28, 2002.

[15]The number of contributions and signed supporting forms varies with the office sought as follows: Governor, [$]6,000; Lieutenant Governor, [$]3,000; Attorney General, [$]3,000; Treasurer and Receiver General, [$]3,000; State Secretary, [$]2,000; Auditor, [$]2,000; Councillor, [$]400; State Senator, [$]450; State Representative, [$]200. G. L. c. 55A, § 4. Although the bracketed dollar signs are included in the General Laws of Massachusetts (2000 ed.), they are inconsistent with the official text of the initiative petition presented to the voters, see Official Massachusetts Information for Voters: 1998 Ballot Questions at 15, and appear to be typographical errors.

[16]" 'Election cycle,' as applied to a candidate for a particular [S]tate office, shall be the period beginning on the thirty-first day following a regular [S]tate election for that office and ending on the thirtieth day following the next [S]tate election for that office, inclusive." G. L. c. 55A, § 1. But see St. 2000, c. 159, § 325, an emergency act, approved July 28, 2000, and made effective July 1, 2000, St. 2000, c. 159, § 498 (establishing March 31, 2001, as the start of the 2002 election cycle).

"declaration of intent" to comply with the terms of the clean elections law. G. L. c. 55A, §§ 3, 4. Once the director certifies the candidate, the clean elections law provides that the "certified candidate shall be eligible" to receive distributions from the Massachusetts clean elections fund. See G. L. c. 55A, §§ 1, 7. The director shall then, "subject to appropriation," pay money to certified candidates from the clean elections fund in specified amounts that depend on the office sought and the stage of the election, and at specified times. *Id.* at §§ 1, 7, 8(*a*).[17]

Only one plaintiff, Tolman, a candidate for Governor, has been certified by the director as entitled to receive public campaign funds for his gubernatorial primary campaign.[18] Under the statute he is presently entitled to $811,050 in public campaign funds. See note 7, *supra.* Because the Legislature has not appropriated any money for use by the director for the 2002 election cycle, see note 13, *supra,* neither the $20 million previously placed in the clean elections fund by the Legislature, see note 11, *supra,* nor money voluntarily contributed to the fund through income tax "checkoffs," nor any other source of revenue is available for the director to distribute to Tolman.

By electing to participate in this system and to receive public funds, a clean elections candidate voluntarily agrees to significant restrictions on his or her freedom to wage a political contest. See G. L. c. 55A, § 1 (defining "[a]llowable contribution"); G. L. c. 55, § 7A (*a*) (1). See also Part II.D, *infra.* Clean elections candidates must drastically limit the amount of "soft money" they could otherwise accept from nonparty-affiliated political committees interested in influencing the election or future legislation. Compare G. L. c. 55A, §§ 1 and 10, with

---

[17]Clean elections expenditure and funding limits are periodically adjusted for inflation, G. L. c. 55A, § 13, and candidates running against nonparticipating candidates are eligible to receive "matching funds" of up to twice the allowable expenditure limits, which expenditure limits are also increased. *Id.* at § 11. However, clean elections funding is not unlimited; after 2002, appropriations by the Legislature to the clean elections fund may not exceed one-tenth of one per cent of the Commonwealth's budget. *Id.* at § 14 (*d*).

[18]At oral argument, counsel represented that there is a second certified clean elections candidate, one for the office of State Representative. That candidate submitted an amicus brief prior to oral argument on appropriate remedies. He is not a named plaintiff and has sought no relief here.

G. L. c. 55, §§ 1 and 6A. Without the expectation of receiving funding from the public treasury, few, if any, candidates are likely to choose, or to choose to continue, to abide by the stringent limitations of the clean elections law. To do so against monied opponents might well be futile and quixotic. Candidates who lack private sources of adequate funding for their campaigns are likely to drop out of the election entirely. See *League of Women Voters of Mass.* v. *Secretary of the Commonwealth*, 425 Mass. 424, 429 (1997). See also note 5, *supra.* Thus, the current situation, in which the clean elections law has not been repealed but no money has been appropriated to fund it, does more than disadvantage clean elections candidates. It frustrates the will of the majority of the people who elected to provide an alternative, assertedly more democratic system of campaign financing for Massachusetts electoral offices than the current private financing scheme. See Part II.C, *infra.* We turn now to the plaintiffs' claims against the director and the Secretary.

## II

### A

Because our interpretation of the provisions of art. 48 concerning appropriations bears on our reading of the clean elections law, and the director's obligations thereunder, we consider first the art. 48 question.

We are mindful that art. 48 establishes a "people's process." *Buckley* v. *Secretary of the Commonwealth*, 371 Mass. 195, 199 (1976). It gives the people of Massachusetts the opportunity "to enact statutes regardless of legislative opposition,"[19] a means by which the people "could move forward on measures which they deemed necessary and desirable without the danger of their will being thwarted by legislative action."[20] *Citizens for a Competi-*

---

[19]The plaintiffs claim that proposals similar to the clean elections law have been "stymied" in the Legislature. Similar proposals were introduced in legislative sessions between 1992 and 1998. None was reported favorably out of the Joint Committee on Election Laws.

[20]"Legislative power shall continue to be vested in the general court; but the people reserve to themselves the popular initiative, which is the power of

*tive Mass.* v. *Secretary of the Commonwealth,* 413 Mass. 25, 30 (1992). We construe art. 48 to effectuate its purpose.

In relevant part, art. 48 states: "No measure that . . . makes a specific appropriation of money from the treasury of the commonwealth, shall be proposed by an initiative petition; but if a law approved by the people is not repealed, the general court shall raise by taxation or otherwise and shall appropriate such money as may be necessary to carry such law into effect." Art. 48, The Initiative, II, § 2. We have on several occasions been asked to decide whether an initiative petition is a "specific appropriation of money from the treasury of the commonwealth," prohibited by art. 48 from being placed before the people. See, e.g., *Mazzone* v. *Attorney Gen.,* 432 Mass. 515, 522-523 (2000); *Gilligan* v. *Attorney Gen.,* 413 Mass. 14, 17 (1992); *Associated Indus. of Mass.* v. *Secretary of the Commonwealth,* 413 Mass. 1 (1992); *Tax Equity Alliance for Mass., Inc.* v. *Commissioner of Revenue,* 401 Mass. 310 (1987); *Slama* v. *Attorney Gen.,* 384 Mass. 620 (1981). In contrast, we have not previously considered a claim arising because a law "approved by the people" has not been repealed and the Legislature has not "appropriate[d] such money as may be necessary to carry such law into effect."

Article 48 is unambiguous. A law enacted by initiative may be repealed.[21] Such a law may also be amended by the Legislature, subject to the veto power of the Governor and to the right of referendum by petition. See note 4, *supra.* But absent repeal, the Legislature "shall raise by taxation or otherwise and shall appropriate such money as may be necessary to carry such law into effect." The constitutional command is clear. For as long as a law enacted by way of initiative has not been repealed, the Constitution requires that the Legislature appropriate the funds necessary to its operation.

---

a specified number of voters to submit constitutional amendments and laws to the people for approval or rejection; and the popular referendum, which is the power of a specified number of voters to submit laws, enacted by the general court, to the people for their ratification or rejection." Art. 48, Definition.

[21]The Governor may veto the Legislature's repeal of a law enacted by way of initiative. Art. 48, General Provisions, VI (the General Court's Power of Repeal). The Governor has no independent authority to repeal a statute enacted by initiative. Art. 48, General Provisions, V (the Veto Power of the Governor).

Our acknowledgment of the Legislature's duty under art. 48 regarding laws passed by initiative comports with the intent of the framers of art. 48 as described in the proceedings of the 1917-1918 constitutional convention in which the amendment was forged. Article 48 was debated, framed, and adopted during the heyday of a national movement to give citizens more control over lawmaking by amending State Constitutions to add initiative and referendum provisions. See generally D.B. Magleby, Direct Legislation: Voting on Ballot Propositions in the United States 20-25 (1984). The debate over whether to add initiative and referendum provisions to the Massachusetts Constitution was the focal point of much of the 1917-1918 constitutional convention, and the subject of widespread press attention and public interest. See *Cohen* v. *Attorney Gen.*, 357 Mass. 564, 571-573 (1970).

The delegates did not take the issue lightly. Before they considered the question of the initiative at the general convention, they delegated to a committee on the Initiative and Referendum the task of studying the question and making recommendations. See 2 Debates in the Massachusetts Constitutional Convention 1917-1918, at 3 (1918) (2 Debates). The committee held public hearings and examined the initiative amendments enacted by other States. These included examples of "direct initiatives" — that is, laws enabling the people to bypass the legislative branch entirely and place measures directly on the ballot — and "indirect initiatives," which required action by the Legislature before a "popular" law could take effect. See generally Magleby, *supra* at 35-40. By a bare majority, and over written objections from the minority, the Committee proposed that Massachusetts adopt an initiative provision and recommended that it take the indirect form. 2 Debates, *supra* at 3-16.[22]

The convention delegates did indeed adopt the indirect form of initiative. But the precise scope and wording of the proposal that would become art. 48 was subjected to thorough and hot

---

[22]The minority report, submitted by seven of the fifteen committee members, questioned the general "wisdom and expediency" of popular enactment of statutes and offered specific objections to the proposed amendment. See *Buckley* v. *Secretary of the Commonwealth*, 371 Mass. 195, 200 (1976).

debate, and the committee's original draft amendment was revised substantially. Among the flashpoints was whether to change the proposed amendment as it was originally submitted to prevent the people from enacting laws that required the expenditure of money from the public treasury. The debate on this issue mirrored a larger tension throughout the convention, and throughout much of the Commonwealth at that time, between the people's concern over their government's responsiveness, and the people's fears of being tyrannized by a process that would give free rein to the majority's whims. See *Miller* v. *Secretary of the Commonwealth*, 428 Mass. 82, 84 (1998), quoting *Hurst* v. *State Ballot Comm'n*, 427 Mass. 825, 828 (1998) ("[t]he State Constitutional Convention of 1917-1918 sought a balance between competing impulses toward direct versus representative democracy").

The record of the constitutional convention reveals that delegate Robert Luce moved to qualify the original initiative proposal by adding the following language to the list of subjects to be excluded from the initiative power: "and no law calling for an appropriation of money from the treasury of the Commonwealth, except for purposes incidental to the administration thereof." 2 Debates, *supra* at 815. Mr. Luce and his supporters claimed that the amendment was necessary to prevent demagoguery, and in particular the taking of the property of one group of citizens by another. See *id.* at 817-818. See also *id.* at 820 (remarks of Mr. Buttrick); *id.* at 825 (remarks of Mr. Montague); *id.* at 829 (remarks of Mr. Parkman). Mr. Luce stated that he did not intend the amendment to preclude the expenditure of funds for salaries and other necessities "incidental" to a law enacted by initiative. "What I object to is the possibility of largess, of what was meant by the Latin words, *panem et circenses*, 'bread and the games.' . . . That I do not want demagogues to offer to the people of Massachusetts as a bait for votes." *Id.* at 817 (remarks of Mr. Luce). Demagoguery by initiative could only be avoided by preventing the people's "actual attack upon the treasury." *Id.* at 822 (remarks of Mr. Churchill).

Opponents, however, saw Mr. Luce's proposal as gutting the

reformist purpose of the initiative. One delegate accused Mr. Luce and his supporters of introducing a "weasel" amendment that would render any reform measures enacted by the people "absolutely useless" *id.* at 817, 818 (remarks of Mr. Creamer). (Mr. Luce vigorously denied the charge. *Id.* at 822.) See *id.* at 823 (remarks of Mr. Walker). Other delegates were confused about Mr. Luce's meaning of the word "incidental." See *id.* at 817 (remarks of Mr. Brown); *id.* at 816 (remarks of Mr. Harriman); *id.* at 820 (remarks of Mr. Lomasney) ("I say, sir, we should state clearly what we mean to restrict [the people] to, but not to use the word 'incidental' ").

Perhaps because of its vagueness, Mr. Luce's amendment was defeated. The following day, it was reconsidered. The record suggests that the delegates over all were in a mood to compromise. Deliberations moved from debate about demagoguery to talk of practicalities. See *id.* at 825 (remarks of Mr. Montague). Members of the convention considered how they might balance the need, on the one hand, to prevent "any combination or interest in the Commonwealth [from] asking for a specific appropriation of money for a certain purpose, in the hope that with the purpose and the money being voted on together one would carry the other by," *id.* at 826 (remarks of Mr. McAnarney), and the need, on the other hand, to allow the people to enact reform laws they thought necessary to the general welfare, even if those laws required the expenditure of public funds. See *id.* at 833 (remarks of Mr. Walker) ("[T]he reserve power of the people to make an appropriation when the Legislature neglects or refuses to make one must reside in the people, or else all the teeth are taken out of the initiative and referendum. That is obvious").

In the end, the delegates determined that, by carving out from the initiative powers only those laws making a "*specific* appropriation of money from the treasury of the Commonwealth," art. 48, The Initiative, II, § 2, they could preserve the Legislature's power to appropriate money from the treasury while giving the people power to enact meaningful reform legislation in the face of legislative recalcitrance, even though

such reforms would necessarily require the expenditure of public funds. *Id.* at 833.[23],[24]

Thus, the "specific" appropriations exclusion ultimately adopted by the constitutional convention delegates narrowed considerably the appropriations restrictions Mr. Luce had originally proposed. This more limited appropriations exclusion preserves the people's right, through the initiative process, to enact reform legislation, the implementation of which will require the appropriation and expenditure of public funds. The initiative power is, accordingly, far from toothless.

The delegates also added to the original draft of art. 48 a provision making it constitutionally incumbent on the Legislature to appropriate funds (if necessary by raising taxes) to implement any law the people chose to enact. The delegates explicitly chose to bind the Legislature to make monies available to "carry into effect" any successful initiative petition unless the law is repealed. Repeal was the chosen safety valve, with its attendant consequences of democratic accountability to the voters; the people would learn from the records of any vote which of their legislators voted to repeal the law and which did not.

In stark contrast to the spirited debate over the "specific appropriation" amendment, the "repeal" or "appropriate" provision was added to art. 48 with no recorded debate. See *id.* at

[23]Also expressly excluded from the Massachusetts initiative process are those core rights guaranteed in the Constitution, notably those that protect the minority against the will of the majority: freedom of religion, the right of access to protection in the courts of an independent judiciary, the right of a trial by jury, protection from unreasonable search, freedom of the press, freedom of speech, freedom of elections, the right to peaceable assembly, and the right to receive compensation for private property appropriated for public use. Art. 48, The Initiative, Part II, § 2. That the specific appropriation exclusion was inserted among such august company conveys its importance to the reorganization of the frame of government undertaken in 1918.

[24]The desire of Massachusetts citizens to place significant limits on their initiative powers in art. 48 resulted in a constitutional amendment that as a whole is considerably more modulated than are the initiative amendments to some other States' Constitutions adopted at about the same time. See, e.g., Ariz. Const., art. 4, I, §§ 1(1)-(2) and (4), and § (6)(D) (West 2001) (direct initiative process with specific grant of appropriations power [adopted 1914, as amended 1998]); Ark. Const., amend. 7 (Michie 1987) (direct initiative process with no limitation on enacting appropriations measures [adopted 1911]); Cal. Const. art. 2, § 8 (West 1983) (same [adopted 1966, amended 1976]).

948. Because the convention delegates could be a contentious and polarized lot, we may reasonably infer that this easy passage shows that the delegates viewed the provision as clear and uncontroversial. Without disturbing the Legislature's prerogative to make specific appropriations, they proposed, and the people approved, a constitutional amendment that required the Legislature to be directly accountable to the people.

Against this backdrop, we do not construe the provision that the Legislature "shall appropriate such money as may be necessary to carry such law into effect" as merely referencing the Legislature's discretionary authority to appropriate funds in the normal exercise of its powers. The dissent suggests that this language does nothing more than confirm that it is the Legislature's job to appropriate funds, and that the Legislature's customary unfettered discretion over whether and how much money to appropriate is equally unfettered in the case of a law passed by way of the people's initiative. See Appendix, *post* at 181-185. That interpretation overlooks the additional language providing that the Legislature "shall raise by taxation or otherwise" the necessary funds, and shall as well "appropriate" those funds. Under the dissent's interpretation of art. 48 that language becomes mere surplusage.

The dissent's interpretation would also render the "specific appropriations" exclusion superfluous. If, as the dissent contends, the Legislature always retains full discretion whether to appropriate funds for any law enacted by way of initiative, then it is impossible for any initiative ever to comprise an excluded "specific appropriations." We have held in other cases that the insertion of the term "subject to appropriation" in a proposed initiative petition saves what would otherwise be an excluded "specific appropriation"; such language effectively provides that the Legislature has the discretion whether to appropriate funds or not. See *Associated Indus. of Mass.* v. *Secretary of the Commonwealth*, 413 Mass. 1, 7 (1992). If all appropriations for measures enacted by way of initiative are always a matter of unfettered legislative discretion, they are all "subject to appropriation" and there can be no such thing as an excluded "specific appropriation." We do not believe that the delegates' extended debate on this controversial issue resulted

in a superfluous addition to the list of subjects excluded from the initiative process. Rather, the delegates agreed to exclude only "specific" appropriations from the initiative process precisely because, if passed, any initiative measure that is not a "specific appropriation" must be funded by the Legislature, unless repealed.

## B

The more difficult issue before us is the significance of the language in the clean elections statute itself providing that the distribution of any clean elections funds is "subject to appropriation." G. L. c. 55A, § 8 (*a*). Specifically, does that provision express the people's decision to give the Legislature the unfettered discretion to decide whether and in what amount to appropriate funds for the clean elections program, notwithstanding the otherwise clear command of art. 48?

The parties in this case agree that the "subject to appropriation" language was inserted in the initiative at the recommendation of an assistant attorney general to preclude any contention that the initiative was a "specific appropriation."[25] A "specific appropriation" may not be made by way of initiative, and the insertion of the words "subject to appropriation" excludes any possibility that the initiative is an impermissible "specific appropriation." Of course, if such language were necessary to the constitutional validity of the initiative — in other words, if the initiative would, without such language, constitute a

---

[25]The record shows that prior to submitting the clean elections initiative to the Attorney General for his certification, see art. 48, The Initiative, II, § 3, the proponents of the clean elections law sought the Attorney General's informal review of their draft petition. The assistant attorney general who reviewed the petition advised that, to avoid the risk that the clean elections law could be challenged as a "specific appropriation," the proponents should revise their draft to add the term "subject to appropriation" to the provisions now codified at G. L. c. 55A, § 8 (*a*) (governing director's duty to disburse funds to certified candidates), and at G. L. c. 10, § 42 (establishing clean elections fund). The proponents were, of course, not required to follow the informal advice of the assistant attorney general, no doubt given in good faith. The record is clear, however, that the proponents understood that failure to follow the advice of the assistant attorney general would result in a negative determination by the Attorney General on the issue of "specific appropriation," thereby preventing the clean elections petition from appearing on the ballot. See note 27, *infra*.

"specific appropriation" — we would have to give such language its full, literal effect, restoring to the Legislature the discretion whether to make such an appropriation. On the other hand, if the language "subject to appropriation" were not necessary to prevent the clean elections initiative from being an unconstitutional "specific appropriation," then we would have to assess the effect of this language as intended by those who enacted it. We must, therefore, first decide whether the clean elections law, in the absence of the "subject to appropriation" language, would make a "specific appropriation" of public funds.

The essence of a "specific appropriation" under art. 48 is that money is segregated from the public coffers to be used for a targeted, narrow purpose. See *Associated Indus. of Mass.* v. *Secretary of the Commonwealth, supra* at 5-6; *Slama* v. *Attorney Gen.,* 384 Mass. 620, 626 (1981). In considering whether a measure makes a "specific appropriation," it is immaterial whether the segregated funds are raised by a targeted tax, e.g., *Gilligan* v. *Attorney Gen.,* 413 Mass. 14, 17 (1992) (proposing new tax on tobacco products); *Associated Indus. of Mass.* v. *Secretary of the Commonwealth, supra* (proposing new tax on oil and hazardous waste), or are taken from general revenues, e.g., *Slama* v. *Attorney Gen., supra* (distribution of taxes from general revenues to municipalities), or whether the measure in question sets apart an exact dollar amount. *Id.* The crucial determinant of a specific appropriation is that its "direct purpose" is "to seize upon all the revenue received from the designated sources and to appropriate it *permanently* to a specified public use" (emphasis added). *Id.* at 626, quoting *Opinion of the Justices,* 297 Mass. 577, 580 (1937). It is money that may not be reached by the Legislature (or any other entity or person) except for its specified purpose. It is in this sense inviolable.[26]

The clean elections law does not specifically appropriate

[26]Because a specific appropriation by definition diminishes the total amount of revenue available for disbursement to meet the other needs of the citizens of the Commonwealth in a manner that removes from the Legislature all decision-making power over the use of the segregated funds, a specific appropriation encroaches on the Legislature's constitutional and "quintessential prerogative" to appropriate funds. *County of Barnstable* v. *Commonwealth,*

public money. It does not isolate a specific sum or percentage of money from the public treasury or from special taxation for permanent and certain use for a narrow purpose. It does not "remove[] public monies" from the Legislature's control by "compel[ling] the expenditure of public funds." *Associated Indus. of Mass.* v. *Secretary of the Commonwealth, supra* at 6. The clean elections law merely provides that, if, in any election cycle, a candidate becomes certified by operation of the clean elections law, then that candidate is entitled to receive such clean elections funds as are designated in the statute. See G. L. c. 55A, § 8. Absent from this statutory scheme is the rigid, inflexible, and permanent mandate to disburse public funds for a discrete purpose that we struck down in *Slama* v. *Attorney Gen., supra.* There, a proposed initiative that would have set aside a certain percentage of public revenues for use by municipalities as they chose violated art. 48's ban on specific appropriations measures because the proposed law would "[*p*]*ermanently* . . . lay hold of and appropriate to a *single* public use *all the revenue* received from one source of taxation" (emphasis added). *Id.* at 625, quoting *Opinion of the Justices*, 297 Mass. 577, 581 (1937).

In contrast, the clean elections law bears a closer resemblance to the contingent and flexible tax credit measure that passed art. 48 scrutiny in *Tax Equity Alliance for Mass., Inc.* v. *Commissioner of Revenue*, 401 Mass. 310 (1987). There we held that a law enacted by initiative that provided for tax credits did not violate the art. 48 ban on specific appropriations where the issuance of credits depended, among other things, on over-all State revenues and individuals' ability to qualify for the credits. See *Mazzone* v. *Attorney Gen.*, 423 Mass. 515 (2000). Here, too, the disbursement of clean elections funds is not fixed but depends on numerous factors that cannot be accurately predicted. A specific amount of money is not permanently alienated from the general treasury. The mere fact that the clean elections law

422 Mass. 33, 45 (1996). This prerogative is secured by art. 30 of the Declaration of Rights of the Massachusetts Constitution, Part II, c. 2, § 1, art. 11, of the Constitution, and art. 63 of the Amendments. See, e.g., *Mazzone* v. *Attorney Gen.*, 432 Mass. 515, 522-524 (2000); *Baker* v. *Commonwealth*, 312 Mass. 490, 493 (1942); *Opinion of the Justices*, 302 Mass. 605, 612-614 (1939). See also *Morse* v. *County of Norfolk*, 170 Mass. 555, 556 (1898).

"will require the appropriation of money from the treasury of the Commonwealth to carry it into effect does not, of itself, bring [the] law within the scope of the [art. 48] prohibition" on specific appropriations. *Id.* at 524 n.8, quoting *Opinion of the Justices*, 309 Mass. 571, 583 (1941). See *Gilligan* v. *Attorney Gen.*, *supra* at 17.[27]

In the last analysis, the clean elections law does not restrict the Legislature's power and discretion over appropriations to any greater extent than is inherent in the operation of art. 48's mandate that the Legislature "shall appropriate" funds for a law passed by initiative that it has not repealed. The statute neither bars the Legislature from transferring monies by appropriation out of the fund, see *id.* at 18-19, nor prescribes the precise source from which funds necessary to carry the law into effect must be taken. The clean elections statute, as a law passed by way of initiative, merely requires that, while the statute remains on the books, the Legislature must somehow provide the funds necessary to implement it. Thus, the insertion of the words "subject to appropriation" was not in fact required in order to avoid the "specific appropriation" exclusion of art. 48: even absent the phrase "subject to appropriation," the clean elections law would not constitute a "specific appropriation" under art. 48.

## C

While the insertion of the term "subject to appropriation" in the clean elections law was not *required* to avoid exclusion of that law from the initiative process, we must still determine whether the term has the effect of giving the Legislature discretion to withhold appropriations from the clean elections fund in

---

[27]In an affidavit submitted to this court, the assistant attorney general who advised the drafters of the clean elections initiative petition concerning the requirements of art. 48 stated that, in reliance on *Associated Indus. of Mass.* v. *Secretary of the Commonwealth*, 413 Mass. 1 (1992), and *Gilligan* v. *Attorney Gen.*, 413 Mass. 14 (1992), he has "suggested to proponents of initiative petitions involving the spending of money from the [S]tate treasury that they include 'subject to appropriation' language in their petition in order to minimize the chances of the petition being denied certification by the Attorney General, or, if certified, being challenged in court." However, not all initiative petitions that "involv[e] the spending of money from the [S]tate treasury" implicate the "specific appropriations" prohibition.

the absence of a repeal of the statute. For nothing in art. 48 (or elsewhere in our laws) prevents the people from enacting a reform statute that itself relieves the Legislature of what would otherwise be a constitutional obligation to appropriate funds. If a statute does so, the Legislature is free to take no action on the statute.

We interpret a statute "according to the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated." *Hanlon* v. *Rollins*, 286 Mass. 444, 447 (1934). Accord *Champagne* v. *Champagne*, 429 Mass. 324, 326 (1999). We ordinarily interpret a statute to give every word effect, but we "will not adopt a literal construction of a statute if the consequences of such construction are absurd or unreasonable." *Attorney Gen.* v. *School Comm. of Essex*, 387 Mass. 326, 336 (1982). Here, it is the voters of the Commonwealth who enacted this law. They are the legislators whose intent we must discern; we must interpret the clean elections law to effectuate their "object" and "purpose." *Hanlon* v. *Rollins, supra* at 447.

Beyond doubt, the intent of the drafters of the Massachusetts clean elections law was to improve Massachusetts government by enacting a public finance scheme that would, among other things, allow potential public servants to eschew monied interests in financing electoral campaigns and to allow citizens who otherwise could not afford to run for public office the opportunity to do so.[28] The Findings and Declarations that serve as a preamble to the law declare that the law means to "enhance democracy" by "reduc[ing] the disproportionate and deleterious influence of large contributors [on electoral politics], and restor-[ing] the rights of citizens of all backgrounds to equal and meaningful participation in the democratic process . . . halt-

---

[28]In 1996, the election year preceding the enactment of the law, two-thirds of the Massachusetts legislative elections were uncontested. Deeley, Campaign Finance Reform, 36 Harv. J. on Legis. 547, 550 (1999). During the legislative season leading up to those elections, donors giving $100 or more made up nearly three-quarters of the total $11.4 million contributed, but less than one percent of the State's eligible voters. *Id.*

[ing] the escalating costs of elections . . . diminish[ing] the public perception of [electoral] corruption . . . eliminat[ing] the danger of corruption caused by the private financing of elections campaigns . . . [and] creat[ing] genuine opportunities for qualified residents of the Commonwealth to run for [S]tate office, and encourage more competitive elections." See St. 1998, c. 395, § 1 (*b*) (1). Because the fundamental premise of the clean elections law is that government is more responsive to the people to the extent that its chosen representatives are free from the influence of those providing financial largesse, it is clear that for the drafters of the clean elections law actual public financing of candidates is the heart and soul of the statute.

The record establishes that the Massachusetts citizens who voted to enact the clean elections law in the face of the Legislature's failure to do so considered the clean elections law to be a reform measure. In voting to enact the law, they approved and adopted the goals and purposes recited in the Findings and Declarations, and they intended that the clean elections law further those aspirations without legislative interference. The parties have included in the record a copy of the Official Massachusetts Information for Voters: 1998 Ballot Question (Information), which was published and distributed to all Massachusetts voters by the Secretary, as required by art. 48. See art. 48, General Provisions, III and IV, as amended by arts. 74 and 108. See also art. 48, The Initiative, III, § 1. The Information included the Attorney General's summary, the majority report of the Joint Committee on Ways and Means, and arguments in favor of and against the law. See Information, *supra* at 7-8.

The constitutionally required Information, and the additional included arguments in favor of and against the law, made clear that proponents and opponents alike understood that if the clean elections law were enacted and candidates were certified, public funds would be expended to implement it. Proponents focused primarily on the pernicious role of private monies in a fair elections process: "Wealthy special interests have too much political influence. Campaigns cost too much money. Politicians spend too much time raising money instead of listening to voters. And good people can't afford to run for office." Op-

ponents were adamant that the proposed law would waste public money: "This petition would take taxpayer dollars and spend those dollars on private political campaigns. It would give public money to all political candidates for the purpose of purchasing campaign materials. The proposal would take millions of dollars from education, health care, child care, and public safety. . . . It will be very expensive and it is entirely unnecessary." *Id.* Neither of these arguments advised voters that if enacted, the law might not be funded.

Voters were expressly advised that the Legislature was opposed to the new measure. The Joint Committee, like the opponents, informed the voters that they objected to the law precisely because it would require spending public money. The law would "cause an enormous increase in taxpayer dollars being spent on private political campaigns [and will] dramatically increase the costs to the public. . . . If the supporters of this bill are correct, *the [L]egislature will have to spend approximately $56 million dollars in taxpayers' money . . . . As legislators, we have two choices: vote to increase taxes or take away funding from other meaningful programs* such as education, childcare, affordable housing, public safety, and healthcare. We are uncomfortable with either choice." (Emphasis added.) *Id.* Nowhere did the Joint Committee suggest that, on passage of the initiative, the Legislature would still retain discretion to withhold funds from the clean elections program. And, where the Legislature's opposition to such a program was so clearly announced, we may safely conclude that voters in favor of the clean elections law did not intend to give the Legislature the power to thwart the program by depriving it of all funding.

The lone reference to the distribution of funds being "subject to appropriation by the Legislature" was in the Attorney General's summary of the law. Viewed in the context of the entire Information, in which advocates and proponents passionately argued the wisdom of providing public financing to candidates if the law were enacted, we do not view this single reference as evidence that, in enacting the clean elections law, the people intended to absolve the Legislature of its constitutional obligation to fund the statute so long as it was not repealed. To the contrary, it would produce an "absurd" and

"unreasonable" result to construe the clean elections law in a manner that gives to the Legislature the power to vitiate the measures in the law that were designed to reform the Legislature, among other State offices. *Attorney Gen.* v. *School Comm. of Essex, supra* at 336.

In light of the evidence of record that the framers of the clean elections law and the voters who approved it intended to enact a viable public funding scheme, we conclude that nothing in the provisions of the clean elections statutes relieves the Legislature of its constitutional duties under art. 48 to appropriate funds to carry into effect a law passed by initiative that has not been repealed.[29]

## III

### A

It is the "imperative duty" of the judicial branch of government to say what the Constitution requires, when the question is properly presented. *Horton* v. *Attorney Gen.*, 269 Mass. 503, 507 (1929). See *Marbury* v. *Madison*, 5 U.S. (1 Cranch) 137 (1803). We have determined that art. 48 mandates that the Legislature "raise by taxation or otherwise" and "appropriate such money as may be necessary" to carry the clean elections law into effect. We must now consider whether any plaintiff is entitled to any form of relief where such a statute has been lawfully enacted and has not been repealed, and where funds to carry it into effect have not been appropriated.[30,31]

Not every violation of a legal right gives rise to a judicial

---

[29]Our holding is confined to the facts of this case. The phrase "subject to appropriation" is not, of course, supererogatory in every statute enacted by initiative. See *Gilligan* v. *Attorney Gen., supra* at 17; *Associated Indus. of Mass.* v. *Secretary of the Commonwealth, supra* at 7-8.

[30]The plaintiffs' complaint prays for declaratory and injunctive and such other relief "as justice and equity require." Where "the complaint contained a prayer for general relief," we may enter judgment that "would support any relief consistent with the nature of the case." *Wetherell* v. *Boston Mut. Life Ins. Co.*, 18 Mass. App. Ct. 614, 620 (1984), citing *Commonwealth* v. *DeCotis*, 366 Mass. 234, 246 (1974).

[31]In considering remedies, we have had the benefit of supplemental briefs by the parties and several amici, as well as the parties' supplemental oral arguments and postargument submissions, all of which we acknowledge.

remedy. See *Marbury* v. *Madison, supra.* In this case, however, one plaintiff, Tolman, has demonstrated a cognizable claim under the clean elections law. Tolman has been certified by the director as a clean elections candidate pursuant to G. L. c. 55A, § 5. He has satisfied all of the relevant requirements of the clean elections law, and he continues to abide by its strictures. As a certified candidate, he is entitled to clean elections funds under G. L. c. 55A, §§ 5, 7 (*a*) (1), 8 (*a*) (1), and 13, which he has not received.

We reach that conclusion by turning first, as always, to the text of the law. The clean elections statute is a complex transactional scheme that establishes an ongoing regulatory framework between the Commonwealth and clean elections candidates. The statute explicitly acknowledges that a clean elections process is of benefit to the Commonwealth. See St. 1998, c. 395, § 1 (Findings and Declarations). That is a policy judgment that the people are free to make. Cf. *Commonwealth* v. *Leno,* 415 Mass. 835, 841 (1993). The statute recognizes that in order for the Commonwealth to obtain the benefit of the clean elections law, it must provide an incentive to candidates to forgo the existing alternative of private funding, which, according to the statute's preamble, favors wealthy donors and unlimited campaign spending. See *Buckley* v. *Valeo,* 424 U.S. 1, 39 (1976) (recognizing the candidates' right under First Amendment to the United States Constitution to unlimited campaign spending). That incentive is provided through the benefits of certification under G. L. c. 55A, § 5. Through the certification process, the statute bargains adherence to the clean elections standards for the certainty of public campaign financing, distributed in set amounts and at clearly defined intervals. The director's implementation of the certification process and his certification of a candidate is an affirmative act of the Commonwealth that statutorily binds it to provide the benefit of the clean elections bargain. See G. L. c. 55A, § 8 (*a*) (director "shall" distribute clean elections funds to certified candidates).

In this respect, the clean elections law is similar to other statutes under which we have found the Commonwealth liable for payment to a third party where that third party, to its own detriment, has fully complied with the statutory requirements —

and the State has acknowledged or approved the compliance — such as to confer a direct benefit to the State pursuant to a statutory scheme promising payment for the benefit. See, e.g., *Massachusetts Gen. Hosp.* v. *Commissioner of Pub. Welfare*, 359 Mass. 206, 209 (1971) (where money was owed by executive agency "either on an actual or implied contract, or a statutory liability," agency became liable when private entity rendered services with agency's "knowledge or approval, or in circumstances which bound it to pay for them"). See also *Perkins Sch. for the Blind* v. *Rate Setting Comm'n*, 383 Mass. 825, 828-829 (1981); *Springfield Hosp.* v. *Commissioner of Pub. Welfare*, 350 Mass. 704, 707 (1966). Cf. *Boston Elevated Ry.* v. *Commonwealth*, 310 Mass. 528, 548 (1942) (where statute provided license as inducement to company to build and operate railways at certain location within certain statutory provisions, license was "binding upon the Commonwealth" and could not be revoked by subsequent statute "at the pleasure of the Legislature"). That the express language of G. L. c. 55A, § 8 (*a*), makes distributions to clean elections candidates both mandatory and "subject to appropriation" does not vitiate the Commonwealth's payment obligations where a candidate has complied with the statute with the knowledge and approval of the director and has been certified by the director. The director's certification furthers the intent of the clean elections law and operates as a concession that Massachusetts is "carry[ing] [the clean elections] law into effect," as art. 48 requires in the absence of repeal.

The record is clear that, for Tolman, the successful quest for clean elections certification was not a theoretical exercise in civics but a concerted effort to obtain the benefits of the statute. He has attested in unchallenged affidavits that he adhered to the requirements of the clean elections law in order to be certified as a clean elections candidate, and thereby to receive clean elections funds.[32] Because of the director's conduct, both before and after the inception of this lawsuit, Tolman was able to maintain

---

[32]Tolman stated that he was encouraged to seek the office of Governor based on "the promise of public funding" offered in the clean elections law. Tolman further stated that "[m]y campaign will be seriously disadvantaged if public campaign financing is not made available immediately. . . . By obeying the $100 contribution limit, I am raising far less in campaign contributions

his drive for clean elections certification. The director took all possible steps to implement the statute, thereby permitting candidates to participate in the clean elections scheme. He promulgated numerous detailed regulations regarding clean elections certification, and has created forms for certification of applicants. See 970 Code Mass. Regs. §§ 5.00 (1999).

The director also has played a direct role in the certification process. On November 26, 2001, Tolman applied for certification, and the director accepted and reviewed his application. See G. L. c. 55A, § 5 (*d*). On November 30, 2001, some six weeks after this lawsuit was filed, the director notified Tolman that he had been certified pursuant to G. L. c. 55A, § 5. That same day, the director also notified the comptroller of the Commonwealth in writing that Tolman's application to become a certified candidate had been approved and that "a distribution of $811,050 is required to be made [to Tolman] within five business days after certification," under G. L. c. 55A, §§ 7 (*a*), 8 (*a*) (1), and 13. The director enclosed in his letter to the comptroller an official payment voucher in the amount of $811,050 to be processed in favor of Tolman, as the "vendor," from the Massachusetts clean elections fund.

Tolman never received the clean elections funds that the director certified as due to him. The Commonwealth's failure to honor Tolman's voucher has caused him, and continues to cause him, harm that can only be redressed by payment to him of the funds the Commonwealth pledged. Cf. *Durant v. State,* 456 Mich. 175, 209-210 (1997) (in absence of specific remedy in voter-enacted constitutional amendment requiring State to provide funding for special education and school lunches, court

than if I were not participating in the clean elections system. Neither do I have enough personal wealth to mount a viable campaign without public financing."

With the approval of the director Tolman reasonably proceeded on an expectation of receiving clean elections money. By the time the 2002 elections cycle commenced, on March 31, 2001, the Legislature had already committed $20 million to the clean elections fund in two separate annual appropriations laws. The only limiting provision to those specific appropriations was that the money not be released from the clean elections fund until the 2002 elections. See note 11, *supra.* The fiscal year 2002 budget, for the fiscal year commencing July 1, 2001, contained no clean elections appropriation, but it was not enacted until December 1, 2001, by which time Tolman was already certified.

awarded school districts money judgments against State incident to declaratory relief under court rules).

The director may have had other options than those he chose. Had he doubted the viability of the clean elections law, or his authority to certify candidates in the absence of clean elections funding, he could have sought the opinion of the Attorney General or other appropriate counsel concerning his legal obligations. He could have filed a declaratory judgment action seeking a court's determination of his legal obligations in the absence of repeal or appropriation. He did not refuse to authorize Tolman to proceed as a clean elections candidate, withhold certification applications, or delay acting on any application until funding was available or until a court determined his legal obligations. The director did none of those things. He certified Tolman, thus binding the Commonwealth to the clean elections bargain.

The defendants concede that this court has the authority to order a money judgment for Tolman. But they claim that "nothing in the [c]lean [e]lections law or elsewhere waives the Commonwealth's sovereign immunity to a suit seeking such a money judgment." They maintain that abrogation of sovereign immunity by this court would be unwarranted, that the Legislature should have an opportunity to decide the immunity issue before the court acts, and that if the court decides to abrogate sovereign immunity under the clean elections law, it should do so explicitly.

The defendants misread the fundamental nature and purpose of the clean elections law. Sovereign immunity has posed no barrier to recovery where, as here, the Commonwealth has been held liable to pay money to a plaintiff by virtue of the State's breach of its own expressly acknowledged statutory obligations and the plaintiff's action in conformity with the statutory scheme to his detriment. See, e.g., *Massachusetts Gen. Hosp.* v. *Commissioner of Pub. Welfare, supra*; *Perkins Sch. for the Blind* v. *Rate Setting Comm'n, supra*; *Springfield Hosp.* v. *Commissioner of Pub. Welfare, supra.*

Even if sovereign immunity were to apply to the circumstances of this case, it would be waived by the clean elections law itself, thus making judicial abrogation unnecessary. The

doctrine of sovereign immunity holds that "[t]he Commonwealth 'cannot be impleaded in its own courts except with its consent, and, when that consent is granted, it can be impleaded only in the manner and to the extent expressed . . . [by] statute.' " *Woodbridge* v. *Worcester State Hosp.*, 384 Mass. 38, 42 (1981), quoting *Broadhurst* v. *Director of the Div. of Employment Sec.*, 373 Mass. 720, 722 (1977). "Consent to suit must be expressed by the terms of a statute, or appear by necessary implication from them." *Woodbridge* v. *Worcester State Hosp.*, *supra* at 42.[33] See *Bain* v. *Springfield*, 424 Mass. 758, 764 (1997) ("we do insist on a specific statement or clear implication before we take the Legislature to have waived the immunity of the Commonwealth"). The "rules of construction governing statutory waivers of sovereign immunity are stringent." *Id.*, quoting *Woodbridge* v. *Worcester State Hosp.*, *supra.*

The people, not the Legislature, enacted the clean elections law, under the initiative provisions of art. 48. To the extent that we are required to ascertain whether there has been a waiver of sovereign immunity, it is to the wishes of the people, not the Legislature, that we must look. Their position is clear: the abrogation of sovereign immunity is inherent in the certification process and in the regulatory purpose of the statute that we have described above. The power to bind the Commonwealth to payments of public funds by the process of certification is required "by necessary implication" from the clean elections law, see *Woodbridge* v. *Worcester State Hosp.*, *supra* at 42; the certification process, and the director's role in it, has no meaningful function without the obligation for payment.[34] *Id.* We will not impute to the voters who enacted the clean elec-

---

[33]"Since sovereign immunity is a judicially created common law concept, we reject the assumption . . . that the consent of the Commonwealth to suit may be derived only from the Legislature." *Morash & Sons* v. *Commonwealth*, 363 Mass. 612, 615 (1973). Sovereign immunity is a doctrine that "can be discarded by the courts." *Id.* at 619.

[34]The clean elections law is quite different from the statute at issue in *Woodbridge* v. *Worcester State Hosp.*, 384 Mass. 38, 42 (1981), on which the defendants rely, where the challenged statutory scheme was merely aspirational, setting forth ideals that were never intended directly to bind the Commonwealth to any particular action. *Id.* The clean elections law is the antithesis of an aspirational statute.

tions law an "intention to pass an ineffective statute." *Boston Elevated Ry.* v. *Commonwealth*, 310 Mass. 528, 548 (1942).

Moreover, a waiver of sovereign immunity in the matter of monies due to certified candidates harmonizes with other provisions in the clean elections law. The statute permits candidates whom the director decertifies, and who thereby lose public funds, to obtain judicial review of his decision in Superior Court or the Supreme Judicial Court for Suffolk County. See G. L. c. 55A, § 16 (*c*), (*g*). It would be perverse to read the clean elections statute, which was enacted as a government reform measure, as invoking sovereign immunity only where the Commonwealth withholds payments to certified candidates who maintain their bona fides, while providing that public funds be returned to a candidate who has been wrongfully decertified.

Finally, this is not a case where sovereign immunity is appropriately invoked in order to protect the discretionary functions of a public official, see *Whitney* v. *Worcester*, 373 Mass. 208, 219 (1977), or to prevent the unauthorized actions of a public official, see *George A. Fuller Co.* v. *Commonwealth*, 303 Mass. 216 (1939), or to shield the public fisc from the specter of virtually unlimited liability. See *Morash & Sons* v. *Commonwealth*, 363 Mass. 612, 623 n.6 (1973). Nor is this a case where judicial action on sovereign immunity is appropriately deferred to provide an inducement to the Legislature to abrogate the immunity on its own. See, e.g., *Hannigan* v. *New Gamma-Delta Chapter of Kappa Sigma Fraternity, Inc.*, 367 Mass. 658 (1975); *Morash & Sons* v. *Commonwealth, supra*. Here, no reasons of "justice and public policy" argue for the application of sovereign immunity. *Id.* at 623.

We also observe that art. 48 enumerates several areas that cannot be the subject of a law passed by initiative. See art. 48, The Initiative, II, § 2. See also note 23, *supra*. Sovereign immunity is not one of them. Had the framers of art. 48 wished to exclude waiver of sovereign immunity in any law enacted by way of initiative, they surely would have done so explicitly. Should the Legislature become concerned that a statute passed by initiative unduly exposes the sovereign to liability, it is free to employ the art. 48 safety valves of repeal or amendment to remedy the perceived threat. See *id.* (repeal); art. 48, General Provisions, VI (amendment).

In short, we find that the statutory scheme of the clean elections law forecloses the defense of sovereign immunity, and that Tolman is entitled to judgment in his favor in the amount to which he is entitled as a certified candidate. Cf. *Durant* v. *State*, 456 Mich. 175 (1997). Our holding is a narrow one. The Commonwealth's liability arises from the affirmative acts of an authorized official of the Commonwealth, the director, in certifying Tolman as a clean elections candidate under G. L. c. 55A, and from the inextricable relationship established by the statute between clean elections certification and clean elections funding.

## B

The plaintiffs have asked for declaratory and injunctive relief against the director that would order him to provide public campaign monies from the clean elections fund to "all eligible candidates" under the clean elections law. See G. L. c. 55A, § 8. Ordering the director to distribute clean elections funds would accomplish nothing. The parties have stipulated that "[n]one of the money" previously transferred by the Legislature from the general fund to the clean elections fund and none of the money in the clean elections fund from other sources "is currently available for the [director] to distribute to certified candidates." In the absence of an appropriation the director has no power to order that monies be disbursed from the clean elections fund. See Part I, *supra*. Because the director currently has no clean elections funds to distribute and no authority on his own to reach those funds, he cannot be ordered to distribute them.

The plaintiffs have also argued that the clean elections law may not be repealed during the 2002 clean elections cycle. That relief — directed as it must be to the General Court in the first instance — does not lie. See note 21, *supra*. Article 48 imposes no time limit within which a statute enacted by initiative must be repealed. The Legislature is free to repeal (or amend) the clean elections law at any time. As we noted, the "repeal" or "appropriate" provisions of art. 48 act as a constitutional safety valve. If the Legislature wishes not to appropriate funds for the law, it may repeal it. See art. 48, The Initiative, II, § 2.

Second, as the defendants correctly point out, the court can-

not "interfere with the process of legislation . . . before it is completed, to prevent the possible enactment of an unconstitutional measure." *Bowe* v. *Secretary of the Commonwealth*, 320 Mass. 230, 247 (1946). See *Milton* v. *Commonwealth*, 416 Mass. 471, 475 (1993) (mandamus and declaratory judgment do not lie against Legislature). We will not speculate about the legal impact, if any, that such a repeal might have on the 2002 elections or on any clean elections candidate. See *Bowe, supra* at 245 ("In many cases it would be difficult . . . to say abstractly and unconditionally that a statute is or is not unconstitutional"). See also *Animal Legal Defense Fund, Inc.* v. *Fisheries & Wildlife Bd.*, 416 Mass. 635, 638 (1993), quoting *Slama* v. *Attorney Gen.*, 384 Mass. 620, 624 (1982), and *Kaplan* v. *Bowker*, 233 Mass. 455, 459 (1956) (" '[t]o have standing in any capacity, a litigant must show that the challenged action caused the litigant injury.' . . . '[O]nly persons who have themselves suffered, or who are in danger of suffering, legal harm can compel the courts to assume the difficult and delicate duty of passing upon the validity of the acts of [another] branch of government' "); *Massachusetts Ass'n of Indep. Ins. Agents & Brokers, Inc.* v. *Commissioner of Ins.*, 373 Mass. 290, 293 (1977).

The choice between available constitutional options is for the Legislature. See *Bromfield* v. *Treasurer & Receiver Gen.*, 390 Mass. 665, 670 n.9 (1983). Having delineated the Legislature's responsibilities under art. 48 with respect to a statute enacted by initiative, we are confident that the Legislature will act to meet its constitutional responsibilities. See *Opinion of the Justices*, 334 Mass. 745, 758-759 (1956) (art. 48 "was adopted in the expectation that all officers concerned would perform the duties required of them at the proper times"). See also *Sears* v. *Treasurer & Receiver Gen.*, 327 Mass. 310, 320 (1951) ("The people themselves and all branches of their government, legislative, executive, and judicial alike, are bound by [the Constitution] and owe to it implicit obedience").

## C

We now turn to the plaintiffs' claims for relief against the Secretary. The plaintiffs premise their claims against him on the theory that the clean elections law is "binding" because it has

not been repealed, and that therefore, because the Legislature has not appropriated funds to carry the statute into effect, every election for State office to be held in 2002 violates both art. 48 and the clean elections law. The relief they seek is sweeping — an immediate injunction barring "any future elections" for Massachusetts statewide or legislative office.

Elections are mandated by the Constitution and the laws of the Commonwealth. The next Statewide election must take place in 2002. See arts. 8-10 of the Declaration of Rights of the Massachusetts Constitution (affirming people's right to vote); art. 64, § 1, of the Amendments to the Massachusetts Constitution, as amended by art. 82 of the Amendments (establishing election of State officers and terms of office); art. 64, § 3, of the Amendments to the Massachusetts Constitution, as amended by art. 82 of the Amendments (establishing date for quadrennial and biennial State elections); G. L. c. 54, § 62 (establishing date for biennial State elections). The Secretary's duty is to fulfil these constitutional and statutory mandates.

In contrast, art. 48 confers no duty on the Secretary to implement a law enacted by initiative.[35] Similarly, the Secretary has no colorable duty to implement the funding provisions of the clean elections law. Simply because the clean elections law was enacted by initiative, the statute does not thereby, as the plaintiffs suggest, obtain the status of a constitutional amendment. Nor does the law modify the Secretary's constitutional or statutory duties to call elections at specified times.

In support of their extraordinary request, the plaintiffs have called our attention to several cases from other jurisdictions in which elections have been enjoined. None supports the broad relief the plaintiffs desire. The plaintiffs place particular emphasis on *Reynolds* v. *Sims*, 377 U.S. 533, 566 (1964), which concerned a Federal constitutional challenge to a Statewide apportionment of legislative districts. Under the challenged apportionment scheme, the votes of persons in different counties

---

[35]The role of the Secretary in the initiative process is a ministerial one, confined principally to shepherding an initiative petition before it is enacted by election of the people. See, e.g., art. 48, The Initiative, V, § 1 (submission of initiative petition to voters); *id.*, The Referendum, IV (preparation of information for voters). Once an initiative petition becomes law, the Secretary's role and his obligations under art. 48 cease.

were weighted differently, resulting in the dilution of voting power in certain geographic areas and the enhancement of voting power in others. The weight of every vote in every race was unbalanced. Here there is no factual basis in the record to support the plaintiffs' claim that, unless all certified candidates are fully funded, every Massachusetts voter will be deprived of the intended benefits of the clean elections law (and a meaningful initiative process) in every upcoming Massachusetts electoral contest.

The plaintiffs have not demonstrated that clean elections candidates are running, or intend to run, in each and every election they seek to enjoin. There may be many district and Statewide races in which no candidate (present or future) chooses to abide by the clean elections restrictions. In stark contrast, in the *Reynolds* case, the legitimacy of every possible vote was compromised by an unconstitutional voting system. The systemic imbalance, justifying the exceptional relief there granted, is absent here.

Granting an injunction against the Secretary will not give the plaintiffs the relief they actually seek and are tacitly requesting: the release of funds to certified clean elections candidates.[36] The plaintiffs are not entitled to the relief they seek against the Secretary.

## IV

We remand this case to the single justice with directions to dismiss the plaintiffs' claims for declaratory and injunctive relief against the director and the Secretary, without prejudice. The single justice shall retain jurisdiction over the plaintiffs' claims against the director and the Secretary for other and further relief. We direct the single justice to enter separate judgment for Tolman against the director in the amount of $811,050. See note 7, *supra*. The single justice shall retain jurisdiction to award such other and further relief to Tolman to which he is or

---

[36]We do not address the plaintiffs' argument that an order enjoining the 2002 elections would be a powerful inducement to the Legislature to fund the clean elections law. The argument misperceives our role under art. 30 as a coequal branch of government owing respect and deference to the other coequal branches. It turns the rule of law into a strategy game.

may become entitled under the clean elections statute, consistent with this opinion. The single justice shall retain jurisdiction to grant relief to any other candidate plaintiff who is or may become entitled to relief under the clean elections statute, consistent with this opinion. She may allow motions to amend or motions to intervene to add additional candidate plaintiffs who may seek relief under the clean elections statute.

"The presumption exists that the Commonwealth will honor its obligations." *Bromfield* v. *Treasurer & Receiver Gen., supra* at 669. The Attorney General, representing the defendants, has made clear in his postargument submissions that, should a money judgment issue, the director "would forthwith take all necessary steps to seek payment of such a judgment from the judgments and settlements account." Nevertheless, should Tolman's judgment remain unsatisfied, he may apply for relief to the single justice, who shall retain jurisdiction over the matter of Tolman's judgment against the Commonwealth should further proceedings be necessary.

To the extent that any further proceedings in this case are required, the single justice has broad discretion to consider such other and further remedies as she deems necessary and appropriate.

*So ordered.*

APPENDIX. .

# COMMONWEALTH OF MASSACHUSETTS

## SUPREME JUDICIAL COURT FOR THE COMMONWEALTH
### IN THE CASE No. SJC-08677

### KELLY BATES & others

*vs.*

### DIRECTOR OF THE OFFICE OF CAMPAIGN
### AND POLITICAL FINANCE & another.

### MEMORANDUM AND ORDER

In October, 2001, the plaintiffs commenced an action in the Supreme Judicial Court for the county of Suffolk against the Director of the Office of Campaign and Political Finance (director) and the Secretary of the Commonwealth (Secretary) seeking declaratory and injunctive relief. A single justice reserved and reported the matter to the full court on the plaintiffs' complaint, a stipulation in lieu of the defendant's answer, and a statement of agreed facts. Upon consideration of the briefs and argument, the court concludes as follows:

(1) The clean elections law, G. L. c. 55A (clean elections law), was approved by the people under the initiative provision of art. 48, The Initiative, V, § 1, of the Amendments to the Massachusetts Constitution. See St. 1998, c. 395, § 2. The initiative petition also created the clean elections fund, G. L. c. 10, § 42. See St. 1998, c. 395, § 3 (rewriting G. L. c. 10, § 42). The clean elections law was enacted by popular initiative, pursuant to art. 48, which provides that "if a law approved by the people is not repealed, the general court shall raise by taxation or otherwise and shall appropriate such money as may be necessary to carry such law into effect."

(2) The court concludes that, unless the Legislature has repealed a law that has been enacted by way of initiative, the Legislature is mandated by art. 48 to raise by taxation or otherwise and to appropriate such money as may be necessary to carry the law into effect.

(3) The clean elections law provides that the distribution of any clean elections funds is "subject to appropriation," G. L. c. 55A, § 8 (*a*). General Laws c. 10, § 42, establishing the clean elections fund, provides, in turn, that amounts credited to such fund "shall be expended, subject to appropriation, only for the purposes set forth in [the clean elections law]." G. L. c. 10, § 42. The "subject to appropriation" language contained in G. L. c. 55A, § 8 (*a*), and in G. L. c. 10, § 42, was not required to avoid the "specific appropriation" exclusion of art. 48, and with or without that language the measure is not a "specific appropriation" under art. 48.

(4) Nothing in the provisions of the clean elections statutes, including the language "subject to appropriation" referred to above, relieves the Legislature of its constitutional duties under art. 48. The clean elections law has not been repealed. Thus, art. 48 commands that, for as long as that law remains in ef-

fect, the Legislature is constitutionally required to appropriate the funds necessary to its operation. To date, the Legislature has not satisfied its constitutional obligation.

In light of the above, the court will proceed to consider, on an expedited basis, the relief that is appropriate, including, but not limited to the following:

(i) whether, in light of the passage of time since the enactment of the clean elections law and the failure of the Legislature to appropriate funds for the 2002 elections, it is still open to the Legislature to repeal the clean elections law for this election cycle;[1]

(ii) whether, in the absence of a vote to repeal the clean elections law, funds to carry the law into effect shall be deemed appropriated as matter of law;

(iii) whether, as suggested by amicus curiae Massachusetts Democratic State Committee, if the Secretary of Administration and Finance is added as a party, he would have any power to authorize payments to certified clean elections candidates;

(iv) whether an injunction should enter ordering the Secretary of the Commonwealth from proceeding with any or all elections in the Commonwealth in the absence of a vote by the Legislature to repeal the clean elections law or to appropriate funds to carry the law into effect;

(v) whether the addition of any further parties is necessary for the relief specified above or otherwise.

The court invites the parties and any other interested persons to file memoranda solely on the question of the appropriate relief. The court does not intend that the above remedies be considered exclusive, and the court invites proposals of any additional and further remedies as may be appropriate. All such submissions, each of which shall include a proposed order, shall be filed on or before 5 P.M. on Friday, February 1, 2002.

An opinion or opinions shall follow.

By the Court,

_____

Susan Mellen, Clerk

ENTERED: January 25, 2002

COWIN, J. (dissenting, with whom Spina, J., joins). In my view, the court misconceives art. 48 and proposes a list of possible remedies, all of which presuppose that the Legislature has acted improperly. The Legislature has acted within its constitutional prerogative in refusing to fund the clean elections law, and it is not for the judicial branch to attempt to override it.

The plaintiffs have sought an injunction ordering the director to provide public campaign funds to eligible candidates and barring the Secretary from holding all future elections until the funds are disbursed to these candidates. In my opinion, we cannot order the director to disburse funds absent a legislative appropriation and enjoining future elections is unjustified. The director

---

[1]The clean elections law applies to all election cycles for Statewide office on or after November 1, 1998, and to all elections cycles for other State offices beginning on or after November 1, 2000. G. L. c. 55A, § 18.

has no power to pay out funds, and we have no power to order him to do so, without a legislative appropriation.

The court, however, decides that the litigation should continue, perhaps with the Secretary of Administration and Finance or others as parties. This implies that other officials are vested with some authority that the court can order them to exercise and that the problem will thereby be solved. Clearly, neither that Secretary nor any other executive official possess such power because no executive official may spend the Commonwealth's money without a prior legislative appropriation. Therefore, the question for decision, which the court today avoids, is whether, absent legislation to appropriate passed in the ordinary course, this court has the power to order an appropriation or to treat the situation as if an appropriation were in place.

It is my view that an appropriation is necessary before an executive official is permitted to spend the Commonwealth's funds. We therefore must determine whether art. 48 requires the Legislature to appropriate funds and, if the Legislature fails to perform its obligation in this regard, whether this court can order the Legislature to appropriate the funds or, in the alternative, deem there to be an appropriation as a matter of law and order the Treasurer or any other executive official to spend the Commonwealth's funds.

I disagree with the court's conclusion that art. 48 requires the Legislature to either repeal the clean elections law or to appropriate such money as may be necessary to carry it into effect. Article 48 provides: "[I]f a law approved by the people is not repealed, the general court shall raise by taxation or otherwise and shall appropriate such money as may be necessary to carry such law into effect." Art. 48, The Initiative, II, § 2. We must read this provision of art. 48 consistently with the provision of art. 48 that excludes specific appropriations from the initiative process. See *McDuffy* v. *Secretary of the Executive Office of Educ.*, 415 Mass. 545, 559 (1993), quoting *Cohen* v. *Attorney Gen.*, 357 Mass. 564, 571 (1970) ("the Constitution 'is to be interpreted in the light of the conditions under which it and its several parts were framed' "). Article 48's provision prohibiting specific appropriations indicates that the drafters intended to keep the appropriation power with the Legislature and feared placing such power in the people. During the 1917-1918 constitutional convention, one proponent of the prohibition on specific appropriations stated that the purpose of the provision was to prevent the people from spending "the money that has been saved for . . . crises . . . without the calm, deliberate, judicious, fair scrutiny that is given by a legislative investigation." 2 Debates in the Massachusetts Constitutional Convention 1917-1918, at 817 (1918) (2 Debates) (remarks of Mr. Luce).

It is clear from the debates that the drafters chose to exclude specific appropriations from the initiative process despite their recognition that such an exclusion would permit the Legislature to thwart the voters' purposes by withholding funding for a measure adopted by popular vote. One delegate cautioned that "if this [provision] is adopted it will be possible to make absolutely useless any legislation proposed by the initiative and referendum." 2 Debates, *supra* at 818 (remarks of Mr. Creamer). The delegates, however, adopted the provision despite this concern because they believed that:

"[N]o Legislature that had received a mandate from the people to put a certain scheme into effect, and that scheme voted for by a

considerable majority of the people, would dare stand up and say: 'We won't appropriate any money for this scheme.' " 2 Debates, *supra* at 822 (remarks of Mr. Churchill).

Thus, although the drafters believed that political pressures would prevent the Legislature from withholding funding, they did not believe that art. 48 itself prevented the Legislature from doing so. The "repeal or fund" provision was adopted without any recorded debate. 2 Debates, *supra* at 948. If the drafters had intended to negate the effect of the earlier-adopted specific appropriations prohibition by requiring a choice between funding and repealing, surely the provision would have been more controversial.

In addition to reading art. 48 consistently with the specific appropriations prohibition, we must read art. 48 consistently with the other articles of our Constitution. *McDuffy* v. *Secretary of the Executive Office of Educ.*, *supra* at 559. Article 63, drafted during the same constitutional convention as art. 48, serves as further evidence that language of art. 48 should not be interpreted as requiring that the Legislature appropriate money to fund laws passed by initiative petition. Article 63 vests the Legislature with the responsibility for managing the financial affairs of the Commonwealth, see *Opinion of the Justices*, 297 Mass. 577, 580 (1937), and provides that "[t]he general court may increase, decrease, add or omit items in the budget." Article 63, § 3, of the Amendments to the Massachusetts Constitution. This suggests that the provision of art. 48 that the Legislature "shall appropriate such money as may be necessary to carry such law into effect" implies "as determined by the general court," so that the Legislature bears sole responsibility for determining the amount of appropriation, if any, that is necessary.

Further, we must interpret art. 48 consistently with art. 30 of the Massachusetts Declaration of Rights, which states that the "judicial [branch] shall never exercise the legislative . . . powers." See *Alliance AFSCME/SEIU* v. *Secretary of Admin.*, 413 Mass. 377, 382 (1992) ("The power to appropriate is exclusively that of the Legislature"). Article 30's principle of separation of powers prevents the "judiciary [from] substituting its notions of correct policy for that of a popularly elected Legislature." *Commonwealth* v. *Leno*, 415 Mass. 835, 841 (1993), quoting *Commonwealth* v. *Lammi*, 386 Mass. 299, 300 (1982). The framers of art. 48 were well aware of the limitations imposed by art. 30 and presumably did not enact a provision that would violate its mandate.

Just as art. 30 prohibits the judicial branch from exercising a legislative function, it prohibits the judicial branch from exercising an executive function. The court's interpretation of art. 48 would not only encroach on the constitutional powers of the Legislature, but those of the executive branch as well. The Governor may veto an appropriation, reduce its amount, sign the bill, or allow it to become law without signature. Art. 63, § 5, as amended by art. 90, § 4, of the Amendments. See *Alliance, AFSCME/SEIU* v. *Secretary of Admin.*, *supra* at 382. If we impose any remedy that bypasses the Governor's role in the appropriation process, we exercise an executive function. While the Governor may well choose to sign a clean elections appropriation bill should one be presented, we cannot dispense with her constitutional role by assuming

she would do so. See *id.* at 383 ("Governor's approval of the bill cannot be presumed, nor can presentment to the Governor be dispensed with as a mere formality").

The interpretation advocated by the court is also unworkable; it will result in numerous challenges to the Legislature's authority to control the budget. The clean elections law avoids the need for legislative deliberation on the proper level of funding because it sets forth the amounts to be appropriated by formula. See G. L. c. 55A, §§ 1, 7, 8 (*a*). Often, however, only the Legislature will have the resources and expertise to decide the level of appropriation necessary to effectuate a law. The drafters could not have intended a system in which voters challenge the Legislature's appropriation measures whenever they believe that they are insufficient to carry out the petition's purpose. This is precisely why, as discussed above, art. 48's directive that the Legislature "shall appropriate . . . money as may be necessary to carry such law into effect," must be interpreted to require a legislative determination as to what is necessary, including a determination that what is necessary is nothing at all. Art. 48, The Initiative, § 2.

Even if art. 48 requires the Legislature to fund or repeal a law passed by initiative petition, the language of the clean elections law provides that its implementation is dependent on a legislative appropriation. The majority rewrites the initiative petition and the resulting statute by ignoring the phrase "subject to appropriation," although this language indicates that the provisions of the measure were not intended to be effective without a legislative appropriation. See *Associated Indus. of Mass.* v. *Secretary of the Commonwealth*, 413 Mass. 1, 7 (1992) ("It is difficult to imagine how a measure that is 'subject to appropriation' could have been intended to be an appropriation in and of itself"). See also *Gilligan* v. *Attorney Gen.*, 413 Mass. 14, 19-20 (1992) ("[T]he inclusion in the summary of the phrase 'subject to appropriation by the state Legislature' accurately and fairly informs voters of the precise contingency involved").[2]

I disagree with the court's conclusion that, even absent the "subject to appropriation" language, the clean elections law would not constitute a specific appropriation. A specific appropriation is one that "removes public monies, and the decision how to spend them, from the control of the Legislature." *Associated Indus. of Mass.* v. *Secretary of the Commonwealth, supra* at 6 (initiative petition establishing excise tax and creating fund to be used for cleanup and control of hazardous waste did not violate art. 48 because money in fund was to be used for this purpose "subject to appropriation"). See also *Tax Equity Alliance For Mass., Inc.* v. *Commissioner of Revenue*, 401 Mass. 310 (1987) ("An appropriation designates a sum of money to be devoted to some object").

The clean elections law sets aside money from the public treasury for the particular purpose of providing funds for candidates who agree to abide by the law's restrictions. As discussed above, the statute enumerates by formula the exact amounts to be distributed to clean elections candidates. See G. L. c. 55A,

---

[2]The Attorney General's summary for the petition in the instant case provides: "Candidates meeting all these requirements would, subject to appropriation by the Legislature, receive public funding in the primary and general elections." Information for Voters: 1998 Ballot Questions at 7.

§§ 1, 7, 8 (*a*). Once a candidate meets the requirements set out by the law, the amount of the disbursement is fixed. The clean elections law forces the State to pay money to candidates when they satisfy certain conditions. Therefore, the people, rather than the Legislature, directly decide the amounts of money to be expended. Our Constitution does not permit the people to make this type of determination.

This court does not have the power to grant any of the relief suggested by the court. We cannot order the Legislature to appropriate funds or deem the funds appropriated as a matter of law, and members of the executive branch are powerless to authorize payments to certified clean elections candidates in the absence of a legislative appropriation. This result is a consequence of the separation of governmental powers, a foundational principle of our system with which we should be reluctant to tamper. The plaintiffs' remedy, as it always is with political questions, is at the ballot box. If the public is truly concerned about this issue, it will retaliate in the next election against those they hold to be responsible for frustrating the public will. If the public does not care enough about the issue, there will be no such retaliation. See *LIMITS v. President of the Senate*, 414 Mass. 31, 35 (1992) ("When the purpose of art. 48 has been frustrated, the only remedy may come from the influence of public opinion, expressed ultimately at the ballot box").

GREANEY, J. (concurring, with whom Ireland, J., joins). The court, acting through the defendants before it, has, in effect, entered a declaratory judgment setting forth the mandate of art. 48 of the Amendments to the Massachusetts Constitution; established the Legislature's violation of the mandate; found sovereign immunity inapplicable; and determined candidate Warren Tolman's entitlement to the immediate entry of a judgment. I agree with this declaration. I write separately to clarify certain issues.

It is important to emphasize why Tolman (and others) are entitled to immediate relief. Tolman was not injured by any conduct of the director. His right is grounded on the clean elections statute, which, in turn, is based on art. 48. His entitlement is therefore hybrid in nature, both constitutional and statutory, and the monies due him constitute a property right, suitable for encompassment in a judgment. The right, as a property right, cannot now be abridged by the Commonwealth.

At this stage of the proceedings, the clean elections statute is basically self-executing. All certified candidates are entitled to the funds allotted by the statute to their candidacies. Even if the statute is repealed, no certified candidate can be denied the funds due him or her.

With these principles in mind, I now comment on the remedy provided.

(a) I agree that new plaintiffs should be added by way of amendment to the complaint or intervention, as they become clean elections candidates. The affidavits attached to the complaint indicate that there are a number of these candidates who intend to run Statewide and in local representative and senate races.

(b) As stated, all such candidates will acquire vested property rights once certified. Repeal of the statute may terminate further candidacies. I am not certain about the Legislature's power to amend the clean elections statute. The power to repeal may include the authority to amend. On the other hand, amendments which effectively nullify the main purpose of the statute may not be valid, in the absence of outright repeal. If the issue of amendment becomes relevant, I would like briefing on the Legislature's authority.

(c) The director's role is essentially ministerial. Candidates who have joined the lawsuit and have been certified should, like Tolman, receive judgments and executions. The grant of executions is appropriate to expedite payments. It is assumed that the Legislature will promptly appropriate funds to pay the judgments. If not, the executions may be used to satisfy the judgments out of Commonwealth property.

(d) To the extent necessary to process claims, the single justice has available to her any necessary equitable tools, including, if appropriate, the appointment of a special master and receivers.

(e) I note that some plaintiffs may be entitled to future relief against the director and Secretary. For example, elections in districts where certified candidates are being denied funds might have to be enjoined until a proper election is held. Similarly, an improperly held election in a given district might have to be voided. These are possible future considerations.

One final comment is in order. There should be no controversy over the role of the Justices in this case. We came to this case, complicated as it is, with no preset brief or bias and with the utmost respect for the legislative and executive branches. It is our quintessential function, as the court observes, to declare and enforce the law. We have tried to honor this obligation conscientiously. Now that we have set forth a constitutional exegesis that affirms the clear voice of the people as stated in the Findings and Declarations in St. 1998, c. 395, § 1, we expect the other branches of government to abide by their obligations.

SPINA, J. (dissenting, with whom Cowin, J., joins). Today the court has reshaped our Constitution in three significant respects. It requires the Legislature under art. 48 of the Amendments to the Massachusetts Constitution to appropriate funds to implement laws enacted by the people; it has stripped the Legislature of its discretion under art. 63 of the Amendments to the Massachusetts Constitution to make appropriations for laws enacted under art. 48; and it has made a constructive appropriation in violation of art. 30 of the Massachusetts Declaration of Rights

in order to create a private remedy for what it has determined is a failure of the Legislature to act.

First, the gloss that the court has placed on art. 48 effectively gives the people the power to do indirectly that which they cannot do directly, namely, enact a measure that makes a specific appropriation of money. See art. 48, The Initiative, II, § 2. Although the court says that the clean elections law does not specifically appropriate public funds, the law has been transformed into an appropriation because it "engages" art. 48. *Ante* at 146. Article 48 now imposes on the Legislature a duty to appropriate funds necessary to implement any law enacted by the initiative process and the court has made clear its willingness to provide a remedy for the Legislature's failure to carry out that duty. Thus, the mandate of art. 48 makes all such laws self-appropriating. The fact that they may be repealed makes them no less so. The court's interpretation of art. 48 was not, in my view, ever contemplated by the constitutional convention.

Second, the court's all-or-nothing interpretation of art. 48 has done violence to art. 63. Until today, the Legislature had unqualified discretion under art. 63 to appropriate money. That discretion is now qualified by the mandate of art. 48 that all laws enacted by the people be fully funded. This exception to the Legislature's authority under art. 63 places initiative laws in a category above other laws. Laws enacted by the people have become super laws, because they alone must be fully funded.

The third area affected is the principle of separation of powers, embodied in art. 30. Today, the court has intruded on the legislative function by granting relief to a litigant for what the court has determined is the failure of the Legislature to perform a duty assigned to it by the Massachusetts Constitution. Although I do not agree that the Legislature has failed to perform any duty, we have, historically and constitutionally, refrained from granting relief in such circumstances. See, e.g., *LIMITS* v. *President of the Senate*, 414 Mass. 31, 35 (1992); *Alliance, AFSCME/SEIU* v. *Secretary of Admin.*, 413 Mass. 377, 383-384 n.9 (1992). The court has not directly ordered the Legislature to do anything, but it has created a remedy that amounts to a constructive appropriation. This, in my view, violates art. 30.

Finally, I believe that the cases relied on to create a remedy

for certified candidates are inapposite to the situation. Those cases involved contract claims or a right to obtain a license. *Ante* at 169-170. By contrast, the clean elections law specifically provides that payments to certified candidates are to be made from the clean elections fund, which is subject to appropriation. See G. L. c. 55A, §§ 7, 8 (*a*). Although the director may have certified a qualifying candidate to receive funds, there has been no appropriation. That is a matter of public record. There could be no reliance, and there should be no remedy. The law creates no right to funds unappropriated. See *Milton* v. *Commonwealth*, 416 Mass. 471 (1993).

For the foregoing reasons, I respectfully dissent.


COWIN, J. (dissenting, with whom Spina, J., joins). Having already expressed my view that the Legislature has acted within its constitutional prerogative, and that, accordingly, the plaintiffs have no rights to be vindicated, it is my opinion that no remedy is appropriate. Therefore, I respectfully dissent.