van Gestel, J.
This matter comes before the Court pursuant to Mass.R.Civ.P. Rule 12(c) and Superior Court Standing Order 1-96 on a motion for judgment on the pleadings by the plaintiffs, Liberty Mutual Insurance Company (“Liberty Mutual”) and The Premier Insurance Company of Massachusetts (“Premier”), against the defendants, the Commissioner of Insurance (“the Commissioner”) and Commonwealth Automobile Reinsurers (“CAR”). What is involved is the transfer of two Exclusive Representative Producers (“ERPs”) from Horace Mann Insurance Company and Teachers Insurance Company (collectively “Horace Mann”), one ERP to Liberty Mutual, and the other to Premier.
BACKGROUND
By G.L.c. 175, Sec. 113H, motor vehicle liability insurance is provided to applicants who are otherwise unable to obtain insurance — the involuntary or residual market — under a plan by which the resulting expenses and losses are apportioned among all licensed motor vehicle insurance companies. All motor vehicle insurers licensed to do business in Massachusetts are required to participate as members of CAR in a plan (the “Plan”) prepared by its Governing Committee and approved, after public hearing, by the Commissioner. Liberty Mutual and Premier are members of CAR.
CAR is an unincorporated association comprised of all private insurance companies which write motor vehicle insurance in Massachusetts. CAR was created by private insurance companies at the Legislature’s direction, pursuant to G.L.c. 175, Sec. 113H, to ensure that companies writing private passenger motor vehicle insurance in Massachusetts serve the involuntary market. Under Rule 20, B of the CAR Rules of Operation, appeals from decisions of the Governing Committee of CAR lie to the Commissioner.
The Plan provides that the Governing Committee shall adopt a set of rules, including rules providing for the fair and equitable distribution of losses and expenses. See, e.g., Trust Insurance Company v. CAR, 46 Mass.App.Ct. 657, 658 (1999).
Agents and brokers who write motor vehicle insurance in Massachusetts and who are unable to obtain voluntary relationships with an insurance company may apply to CAR for appointment to an involuntary relationship. These agents and brokers are what are referred to above as ERPs. Insurance companies that enter into such relationships are called Servicing Carriers. CAR has adopted a plan to fairly allocate ERPs based on each Servicing Carrier’s total market share. Carriers which have a smaller market share of the ERP market than their share of the total market are called “undersubscribed”[3] companies, and they will receive additional ERPs as their applications are approved by *96 CAR. See Trust Insurance Company v. Commissioner, Suffolk Superior Court, Civil Action No. 95-5238 [7 Mass. L. Rptr. 64).
The Plan provides in Article V, in material part, as follows:
A Member may be excused from its Servicing Carrier responsibilities for Exclusive Representative Producer business if the Member executes an agreement with another entity for handling its share of private passenger and/or commercial motor vehicle Exclusive Representative Producer business . . . Nothing in this paragraph shall be construed to affect the right of any Servicing Carrier to enter into any contractual agreement for the purpose of servicing the Servicing Carrier’s voluntary or ceded business.
Horace Mann was granted permission by the Commissioner and CAR to cease writing motor vehicle policies in the Commonwealth effective on December 31, 2001, and two of its ERPs have been transferred by CAR to Liberty Mutual and Premier. Liberty Mutual and Premier contend that the permission allowing Horace Mann to cease writing automobile insurance in Massachusetts and the transfers of two of its ERPs to them have not been done pursuant to CAR Rules or the appropriate statutes.
Horace Mann’s profitable, voluntary agent-produced business has been acquired by Commerce Insurance Company (“Commerce”), but Commerce declined to accept Horace Mann’s obligations as a Servicing Carrier to its ERPs. This is permitted by Article V of the CAR Plan.
In brief history, prior to August 21, 2001, Horace Mann expressed its desire to withdraw from “active participation in” the Massachusetts automobile insurance market. Then, on August 21, 2001, Horace Mann wrote to the Division of Insurance, stating that it wished to retain its automobile insurance licenses. Horace Mann had been more than 125% oversubscribed with ERPs throughout 2001 to the time of the action involved here.
On September 5, 2001, Horace Mann met with Division officials and outlined a proposal to transfer its voluntary business to Commerce, while allowing its ERPs to be reassigned by CAR. On the following day, the same proposal was presented to CAR.
On September 10, 2001, Horace Mann sent a letter to the Chairman of CAR’s Governing Committee, stating that it intended to cease writing private passenger automobile insurance in Massachusetts, that it would make a payment to CAR in accordance with Rule 11 of CAR’s Rules of Operation to cover its future obligations under the ERP system, and that it would then assume “inactive membership in CAR.” This letter was distributed to members of CAR’s Governing Committee prior to its September 19, 2001 meeting. Also, the letter was discussed at the meeting. Representatives of Liberty Mutual and Premier were present at the September 19, 2001 meeting.
Next, on September 21, 2001, Horace Mann sent a letter to the Chairman of the CAR Governing Committee, requesting another Committee meeting to finalize Horace Mann’s financial obligations under Rule 11. This requested meeting was scheduled for October 17, 2001.
On October 17, 2001, the Commissioner, CAR and Horace Mann executed an agreement (the “Agreement”) which allowed Horace Mann to refuse to write motor vehicle liability policies or bonds after December 31, 2001. Included in the Agreement were the following:
CAR Rules 3A provides that an insurer licensed to write motor vehicle insurance policies in the Commonwealth may become an inactive member of CAR upon fulfilling its financial obligations set forth in CAR Rule 11.
Upon the execution of this Agreement Horace Mann will issue non-renewal notices in accordance with the Massachusetts insurance laws of the Commonwealth for all motor vehicle insurance policies scheduled to renew on January 1, 2002 and beyond.
On the date that CAR confirms the receipt of the [Rule 11 payment], CAR shall reassign Horace Mann’s Exclusive Representative Producers to other Servicing Carriers. The reassignment shall be effective at midnight on December 31, 2001, for both new and renewal business.
Earlier in the day, on October 17, 2001, the CAR Governing Committee had a special meeting[4] “at the request of Horace Mann ... to discuss their intent to cease writing private passenger policies in the Commonwealth of Massachusetts and to determine their financial obligations to CAR pursuant to Rule 11 of CAR’s Rules of Operation.” Governing Committee member James T. Masterson of Liberty Mutual was present, as was a representative of Premier.
There is a transcript of the October 17, 2001 meeting. At the outset, counsel for Horace Mann stated: “So the issue before you [the CAR Governing Committee] today is the amount of Horace Mann’s financial obligation under CAR Rule 11, B, 3.” At the end of the meeting the motion to be acted upon by the CAR Governing Committee was stated by Sumner D. Gilman, a member of the CAR Governing Committee, to be: “That Horace Mann be granted the pre-credit relief that they have requested, but my motion also includes, that this issue be looked at, at an ad hoc committee at some time in the future at your discretion.”
Just before the vote, Ms. Kim A. Tobin, who was taking the minutes, was asked to restate the motion. She restated it as follows: “That Horace Mann be granted the pre-credit relief that they seek, and that an ad hoc committee be assigned to look into the *97 future, that an ad hoc committee be assigned in the future to look at the issue.” Mr. Gilman, the member who made the motion, was then asked: “What does that pre-credit relief mean?” The answer he gave was “$6,416,630.”
The motion carried by a vote of 7 to 4, with 1 abstention.
After the receipt of $6,416,630 from Horace Mann, CAR, by a formula previously regularly applied, reassigned Horace Mann’s four ERPs, one of which was reassigned to Liberty Mutual, and another, to Premier.
Liberty Mutual and Premier, at the time of the reassignment, were two of the four most un-dersubscribed Servicing Carriers, ranking second and fourth respectively. They had been undersubscribed for the preceding ten months. The other two un-dersubscribed carriers who were reassigned Horace Mann’s ERPs were National Grange Insurance Company, which received the first reassignment, and Arbella Mutual Insurance Company, which received the third reassignment.
Liberty Mutual protested to the Commissioner that the effect of the CAR vote was to permit Horace Mann to avoid writing business for its ERPs without surrendering its licenses, claiming that to be a violation of CAR Rules. Liberty Mutual insisted that this was a “withdrawal” by Horace Mann without following the CAR Rules therefor. Premier also filed a notice of appeal from the CAR Governing Committee’s October 17, 2001 determination.
Horace Mann suggests that what it did was not a withdrawal but rather a change to inactive member status. Rule 2 of the CAR Rules of Operation contains definitions. “Inactive Member” is defined there as “any insurer which is licensed to write motor vehicle insurance policies or bonds in Massachusetts, but which did not, in fact, issue any motor vehicle policies or bonds in Massachusetts during the most recent calendar year and which is not the issuing company on any outstanding Massachusetts motor vehicle policies or bonds.”
By a letter dated November 9, 2001, the Commissioner responded to Liberty Mutual, Premier and another apparently concerned carrier, Arbella Mutual Insurance Company. The Commissioner stated that she believed “that CAR staff and the CAR Governing Committee followed procedure as currently outlined in the CAR Rules of Operation, in a manner that harmonizes these rules and avoids disruption to consumers and the residual market,” and, accordingly, the Commissioner approved the CAR action of October 17, 2001, and declined Liberty Mutual’s and Premier’s request for further review. In doing so, the Commissioner determined that the Governing Committee’s vote of October 17, 2001: (1) “accelerated the one year cessation of business” requirement in CAR’s Rules of Operation; (2) instantaneously made Horace Mann an “inactive member” of CAR; and (3) triggered the reassignment of ERPs previously assigned to Horace Mann to other Massachusetts insurers rather than Commerce, the insurance company which was contemporaneously acquiring Horace Mann’s voluntary produced insurance business.
Because Liberty Mutual and Premier predicate their contentions — in major part, at least — on CAR Rules of Operation, Rule 3, C, relevant portions thereof are set forth here:
In the event a Member effects a transfer which results solely in the transfer of its obligations for issuing Massachusetts private passenger motor vehicle insurance policies or bonds to another Member for subsequent policy years, then upon said transfer the transferring Member shall be relieved of any future obligations which would have otherwise arisen as a consequence of the business transferred ... If the transfer of coverages described herein involves a transfer of Exclusive Representative Producers which will either cause or increase Exclusive Representative Producer oversubscription for the Member to which the coverages have been transferred, then the number of Exclusive Representative Producers of the transferring Member that either cause or increases the oversubscription shall be reassigned to other Member companies in accordance with CAR’s then approved procedure for such reassignment.
Also implicated in the plaintiffs’ argument is the procedure for withdrawal found in CAR Rules of Operation, Rule 11, B, 3. In material part, that Rule reads:
A company electing to withdraw from the Massachusetts private passenger automobile insurance market shall file a plan for an orderly withdrawal over a period which shall not exceed three (3) years and which shall include full settlement of all financial obligations to CAR. Approval of the plan for purposes of this section shall mean written approval by the Commissioner of Insurance. Prior to approval, the Commissioner of Insurance shall hold a public hearing if requested to do so by the Governing Committee of CAR, and member company of CAR, or any association of producers, to consider-the effect of the withdrawal on the orderly and equitable conduct and operation of the Massachusetts motor vehicle insurance market.
On approval of this plan, data for the withdrawing company shall be removed from the calculation of participation ratios for the remainder of the industry beginning in the first year following the year of election to withdraw . . . Upon request of the company electing to withdraw, CAR may at its option, agree to accept a single payment at any time in settlement of all amounts then outstanding, including those amounts outstanding as a consequence of the calculations specified in this paragraph.
*98 DISCUSSION
Liberty Mutual and Premier argue that there are just three options available to a CAR Member that seeks to eliminate or reduce its obligations concerning the residual market under the CAR Rules and that the Horace Mann transaction did not come within any of these options. Consequently, they contend that the Commissioner’s determination of the validity of the transaction is inconsistent with the administrative scheme of the “assigned risk plan” and contrary to law, and that they suffered economic harm as a result.
The Commissioner responds that Liberty Mutual and Premier have suffered no legally cognizable injury as a result of her ruling and, therefore, lack standing to challenge it. Further, she contends that her actions properly harmonized CAR’s Rules and protected the public interest.
CAR argues that: Horace Mann complied with the inactive membership requirements; the Commissioner’s interpretation of CAR Rule 3A was reasonable; the Governing Committee’s decision to incorporate over-subscription relief into Horace Mann’s buy-out payment is consistent with the purpose of CAR Rule 11; Horace Mann’s inactive status has not prejudiced Liberty Mutual and Premier, and the Commissioner has protected the market from disruption; and Liberty Mutual and Premier were not deprived of due process.
What is really at stake here is that Liberty Mutual and Premier do not like being saddled with the particular ERPs they received on the reassignment from Horace Mann. However, they do not challenge the reassignment process itself. In other words, if reassignment was appropriate, CAR did it in the correct way.
Standing of the Plaintiffs
The Court begins with the Commissioner’s lack of standing argument because if it prevails, the rest is of no consequence.
Citing to two recent cases, Tofias v. Energy Facilities Siting Board, 435 Mass. 340 (2001), and Bates v. Director of the Office of Campaign and Political Finance, 436 Mass. 144 (2002), the Commissioner argues that Liberty Mutual and Premier have suffered no injury from her decision, and therefore they are without standing to challenge it. This, the Commissioner asserts, is because Liberty Mutual and Premier, each being undersubscribed, were due to have the next available ERPs assigned to them in any event.
Tofias is a decision relating to the exercise of discretion by a hearing officer in refusing to permit a party to intervene in a proceeding. In play there was the issue of intervention as governed by G.L.c. 30A, Sec. 10. The rejected intervenor had only a speculative potential for harm from the project in issue. The situation is not similar to what is before the Court here and, consequently, Tofias does not form a basis for challenging the standing of Liberty Mutual and Premier here.
Indeed, and quite in contrast to Tofias, the CAR Rules of Operation specifically provide that any formal Governing Committee decision maybe appealed to the Commissioner. Thus, Liberty Mutual and Premier, as CAR members, are properly before the Commissioner and must, therefore, be seen as having standing to challenge before this Court her ruling on the issue raised by them.
Bates similarly seems inapposite. It was the effort to enforce G.L.c. 55A, Secs. 1 et seq., the Massachusetts Clean Elections Law. The Commissioner here leans on a statement by Chief Justice Marshall in Bates that only persons suffering, or in danger of suffering, legal harm can compel the court to assume the significant duty to pass upon the validity of the act of another branch of government. This comment comes in the course of the declination by the SJC to speculate about the legal impact, if any, of a repeal by the Legislature of the Clean Elections Law. The Chief Justice’s comment in Bates provides little guidance on the standing issue here.
Further, the Commissioner’s decision left in place reassignments to Liberty Mutual and Premier of ERPs, which ERPs by definition generally are money losers to the Servicing Carriers. Economic damages of some amount, even if small, can be presumed for these purposes. And it does not detract therefrom for the Commissioner to argue that Liberty Mutual and Premier, being undersubscribed at the time, would be certain to be reassigned, very soon, the next available ERPs. Those next ERPs may be more or less unprofitable than the ERPs actually reassigned. The claims of Liberty Mutual and Premier do not fail for lack of standing.
Standard of Review
Claims filed in the Superior Court seeking judicial review of an administrative decision must be resolved, as here, through a motion for judgment on the pleadings. See Superior Court Modified Standing Order 1-96; Mass.R.Civ.P. Rule 12(c). Such judicial review is confined to the administrative record, and the Court may modify or set aside an agency decision only if there is an error that prejudices the appealing parties’ substantial rights.[5]
The effective appellants, here, Liberty Mutual and Premier, bear the burden of demonstrating a decision’s invalidity. Coggin v. Massachusetts Parole Board, 42 Mass.App.Ct. 584, 587 (1997); Merisme v. Bd. of App. on Motor Veh. Liab. Policies and Bonds, 27 Mass.App.Ct. 470, 474 (1989). The Court must give due weight to the Commissioner’s experience, technical competence, specialized knowledge and the discretionary authority conferred upon her. Flint v. Commissioner of Public Welfare, 412 Mass. 416, 420 (1992); Massachusetts Auto Body Assoc., Inc. v. Commissioner of Ins., 409 Mass. 770, 781 (1991).
*99 The Court must confine its review to the administrative record, Cherubino v. Board of Registration of Chiropractors, 403 Mass. 350, 354 (1988), and sustain the Commissioner’s decision unless it is unsupported by substantial evidence. Massachusetts Medical Soc’y. v. Commissioner of Ins., 402 Mass. 44, 62 (1988); Solimeno v. State Racing Commission, 400 Mass. 397 (1987). In other words, to the extent the Commissioner’s ruling is one of fact, it stands if supported by substantial evidence. Dohoney v. Director of the Div. of Employment Sec., 377 Mass. 333, 337 n.3 (1979); Buckley v. MCAD, 20 Mass.App.Ct. 172, 175 (1985). “Substantial evidence means such evidence as a reasonable mind might accept as adequate to support a conclusion.” David v. Commissioner of Ins., 53 Mass.App.Ct. 162, 165 (2001).
The Court may not receive additional evidence. Nor is the judicial review a trial de novo. Southern Worc. Cty. Reg. Voc. Sch. Dist. v. Labor Relations Comm'n, 386 Mass. 414, 420 (1982). The Commissioner is the sole judge of the weight to be afforded to the evidence before her. Guarino v. Director of the Div. of Employment Sec., 393 Mass. 89, 92 (1984). It is “within the [Commissioner’s] discretion to disbelieve the [appellants’] version . . .” Yazbek v. Bd. of App. on Motor Vehicle Liab. Policies and Bonds, 41 Mass.App.Ct. 915, 916.
The judge does not properly act as a fact finder . .. The [Commissioner] alone functions as the finder of facts . . . The judge’s function ... is to determine whether [she] applied correct legal principles in reaching [her] decision.
Guarino, supra, 393 Mass. at 92.
A Court is authorized, however, to set aside, modify or remand an administrative decision if it determines “that the substantial rights of any party may have been prejudiced because the agency decision is based on an error of law.”
The Horace Mann Transaction
Liberty Mutual and Premier argue that the Horace Mann transaction in issue did not constitute a withdrawal from the Massachusetts automobile insurance market, nor was it a proper move into inactive status with respect to CAR.
The Commissioner responds that: “While it is true that there is no language in the CAR Rules that explicitly permits a company to accelerate inactive status by paying a lump sum to CAR, there is a Rule (Rule 11(B)(3)) allowing such a ‘withdraw.’ ” See Commissioner’s opposition at pp. 11-12. The Court is uncertain as to whether it should take this remark as an argument that, in the Commissioner’s opinion, the Horace Mann transaction was a withdrawal or an accelerated move to inactive status.
CAR argues head-on that what Horace Mann did was a proper shift to inactive status. CAR opposition pp. 28-33.
Given the parties’ positions — Liberty Mutual and Premier that the Horace Mann transaction was not a proper withdrawal, the Commissioner’s approval of CAR’s applying a withdrawal Rule to an inactive situation, and CAR’s contention that there was a proper move to inactive status — this Court will, for purposes of this decision, determine that what Horace Mann did was not a withdrawal, and proceed to assess the propriety of the parties’ actions in the context of moving to inactive status.
The Horace Mann transaction was one in which its voluntary business was sold to Commerce and Horace Mann’s ERPs were reassigned by CAR to four other carriers, including Liberty Mutual and Premier. CAR suggests that what it did was act the same way that its Rules permit it to act when there is a true withdrawal or an insolvency.
CAR Rules of Operation 3, D provides as follows:
A Member may terminate its membership in CAR as of the close of CAR’s fiscal year upon the surrendering of its license to write motor vehicle insurance policies or bonds in Massachusetts. Terminations in membership shall not discharge or otherwise affect liabilities of a Member incurred prior to termination of membership or in any way affect the Member’s obligation to make payments pursuant to the provisions of CAR Rule 11... and the Member shall be charged or credited in due course with its proper share of all premium, losses and expenses allocable to it under the Rules of operation.
If Rule 3, D is the only route open to Horace Mann, the facts clearly show it did not follow it. At a minimum, Horace Mann did not “surrender!] its license to write motor vehicle insurance policies or bonds in Massachusetts.”
The Commissioner’s November 9, 2001, decision describes the situation and her conclusions about it. It reads in pertinent part:
Horace Mann’s proposal is to maintain its license, but cease writing private passenger motor vehicle insurance in Massachusetts and to assume inactive member status at CAR in a manner designed to minimize disruption to consumers. Pursuant to [CAR] Rule 3A, an insurer seeking inactive member status must fulfill its financial obligations set forth in Rule 11 of the CAR Rules of Operation. Furthermore, Horace Mann sought to become an “inactive member” of CAR as that term is defined in Rule 2 of the CAR Rules of Operation and utilized in Rule 3A by accelerating the one year cessation of business requirement through its offer of a monetary payment to CAR. Accordingly, pursuant to Rule 3A, CAR staff referred to the methodology used in Rule 11 to calculate Horace Mann’s financial obligations to CAR, and after discussion and review at a properly noticed public meeting, the CAR Governing Committee voted 7-4, with one abstention, in favor *100 of this interpretation and application of the CAR Rules of Operation. Therefore, CAR, through the CAR Governing Committee, determined that the procedural requirements delineated in Rule 3A have been satisfied by Horace Mann ... I believe that CAR staff and the CAR Governing Committee followed procedure as currently outlined in the CAR Rules of Operation, in a manner that harmonizes those rules and avoids disruption to consumers and the residual market.
Following the definition of “inactive member” found in Rule 2, and referred to by the Commissioner in her decision, Horace Mann would have to be an insurer “which did not, in fact, issue any motor vehicle policies or bonds in Massachusetts during the most recent calendar year and which is not the issuing company on any outstanding Massachusetts motor vehicle policies or bonds.” The question before Court then becomes, can the one-year cessation-of-business requirement be accelerated through the utilization of Rule 3A?
Rule 3A recites the obligations of inactive members. Included in the Rule is a sentence that reads: “No Member may become an Inactive Member as defined in these Rules until such time as it has fulfilled all obligations set forth in CAR Rule 11 — ASSESSMENTS AND PARTICIPATION.” This particular aspect of becoming an inactive member was satisfied by Horace Mann’s making the $6,416,630 payment after the October 17, 2001 vote by the CAR Governing Committee. But it seems that the definition of an inactive member requires more, particularly the requirements referred to above regarding not, in fact, issuing any motor vehicle policies or bonds in Massachusetts during the most recent calendar year. Consequently, it appears that there is no specific CAR Rule addressing the issue.
The question then moves to whether the CAR Governing Committee, with the approval of the Commissioner, can vote an effective acceleration to inactive status in the manner that it did here.
This Court does not accept the argument by Liberty Mutual and Premier that the CAR Governing Committee, or anyone else present at the October 17, 2001 meeting did not understand that the Horace Mann plan was for it to become inactive immediately, sell its voluntary business to Commerce, have CAR reassign its ERPs and pay the amount voted upon[1] as its contribution and obligation for the following three years under Rule 11. Horace Mann’s intended move to inactive status and the process through which it desired to achieve that status was thoroughly discussed and understood by all at the CAR Governing Committee meeting on October 17, 2001. The administrative record provides substantial evidence that Horace Mann’s intentions were understood by all. What remained in question was whether there were CAR Rules support for doing it in the manner proposed.
The. Commissioner’s conclusion that the “CAR staff and the CAR Governing Committee followed procedure as currently outlined in the CAR Rules of Operation, in a manner that harmonizes those rules and avoids disruption to consumers and the residual market” cannot be said to be either an error of law or not supported by substantial evidence. Nor is it arbitrary or capricious. The CAR Governing Committee, among other things, has the power to take any “action it deems necessary or appropriate to or for the efficient and effective operation of CAR consistent with the purpose and intent of CAR.” CAR Rule 4, C, 13.
Still further, Liberty Mutual and Premier, given their undersubscribed positions at the time, would certainly have had assigned to them ERPs next available from whatever source. Whether those ERPs would be as cost-negative as the ERPs that came from Horace Mann, while perhaps calculable, has not been shown to be of such an amount that would enable Liberty Mutual and Premier to say that the Commissioner’s actions prejudiced “substantial rights” of theirs in the overall scheme of things.
Although the point is argued by Liberty Mutual and Premier, this Court sees no constitutional due process violations in the actions by the Commissioner revealed in the administrative record.
ORDER
For the foregoing reasons, the plaintiffs’ motion for judgment on the pleadings is DENIED, and judgment shall enter dismissing the case.

 Because the words “undersubscribed” and “oversubscribed” appear un-hyphenated throughout the CAR Rules and other documents involved herein, the Court will do so as well in this Memorandum.

 The Court infers that the CAR meeting was before the Agreement was executed because in Paragraph 1 of the Agreement there is inserted in handwriting a dollar number said to be “in accordance with the vote of the Governing Committee of October 17, 2001.”

 The Court may set aside or modify an agency decision that is: in violation of constitutional provisions; in excess of statutory authority or jurisdiction of the agency; based upon an error of law; made upon unlawful procedure; unsupported by substantial evidence; unwarranted by the facts found by the agency on the record as submitted; or arbitrary and capricious, an abuse of discretion or otherwise not in accordance with law.